UNITED STATES of America, Appellee,

v.

Deil Otto GUSTAFSON, Appellant.

UNITED STATES of America, Appellee,

v.

Ralph Edwin BRUINS, Appellant.

Nos. 83–1631, 83–1653.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 12, 1983.

Decided Feb. 29, 1984.

Rehearing Denied March 30, 1984.

James M. Rosenbaum, U.S. Atty., Douglas A. Kelley, Asst. U.S. Atty., Dist. of Minn., Minneapolis, Minn., James L. Forman, Legal Intern, for appellee.

Terence P. Durkin, Dudley & Smith, St. Paul, Minn., Albert J. Krieger, Susan W. Van Dusen, Albert J. Krieger, P.A., Miami, Fla., for appellant Deil Otto Gustafson.

Before HEANEY, ROSS and FAGG, Circuit Judges.

ROSS, Circuit Judge.

On November 5, 1981, defendants Agosto, Gustafson, Newstrum, Bruins, Bacigalupo and Norris were named in a 31 count indictment that charged violations of 18 U.S.C. §§ 1005 (false entry on bank records), 1341 (mail fraud), 1343 (wire fraud), and 371 (conspiracy). Newstrum agreed, pursuant to a plea bargain, to plead to one count of mail fraud and testify on behalf of the government. A jury trial began in United States District Court for the District of Minnesota [1] on January 3, 1981. On January 14, the court granted judgments of acquittal to defendants Bacigalupo and Norris. On January 23, the jury returned its verdict: Agosto was convicted on all counts; Gustafson was convicted on all counts; and Bruins was convicted of 11 counts. On May 3, the district court imposed the following sentences: Agosto received 20 years and a $63,000 fine; Gustafson received 10 years and an $81,000 fine; and Bruins received 3 years and a $20,000 fine. Costs were imposed against Agosto and Gustafson. On August 29, 1983, defendant Agosto died of a heart attack.

On appeal, defendants Bruins and Gustafson raise the following issues: 1) whether government exhibit 500 was improperly admitted under rule 404(b); 2) whether the trial court erred in denying Bruins' motion for a new trial; and 3) whether the trial court erred in refusing to rule on Gustafson's motion in limine to restrict the government's cross-examination of Bacigalupo.[2] For the reasons discussed herein, we affirm.

## I. General Background

Defendant Gustafson, during the relevant time period, owned 20 percent of the Tropicana Hotel and Casino. Gustafson also owned the Summit National Bank of Saint Paul, Summit State Bank of Richfield, Summit State Bank of Phalen Park, Summit State Bank of South Saint Paul, and Summit State Bank of Bloomington. Defendant Newstrum was Gustafson's "right-

---

1. The Honorable Edward J. Devitt, Senior Judge, United States District Court for the District of Minnesota.

2. Prior to oral argument, Gustafson moved to strike the affidavit of Michael Ferrence, Jr., from the record. As it appears that this affidavit was never presented to the trial court, the motion to strike is granted.

hand man" in the operation of the various corporations. Defendant Agosto was the owner of Production and Leasing (P & L), a Nevada corporation, which provided the Folies Bergere floor show to the Tropicana for the sum of $60,000 per week. Defendant Norris was employed by Agosto at P & L as an administrative secretary. Defendant Bruins was the president of the Summit Bank of Richfield and acted as a consultant to the Summit National Bank. Defendant Bacigalupo was the vice president and cashier at the Summit National Bank and personally handled the Tropicana and P & L accounts at that bank.

The subject of this criminal prosecution was a check floating scheme which was conducted to fraudulently assist the Tropicana and P & L's financial position by providing interest-free loans to both enterprises by the Summit Banks of Saint Paul and Richfield during the years of 1977 and 1978. The Tropicana obtained an improper loan from the Summit Bank of Saint Paul by using the bank as its depository bank for Tropicana employees' federal withholding taxes. P & L obtained its loans by using two Summit banks as its depository for federal withholding taxes and by opening commercial checking accounts at both banks. The Tropicana and P & L made deposits to these accounts in the form of nonsufficient fund (NSF) checks. The banks treated these as cash (collected) items and used bank funds to pay Tropicana and P & L obligations. When the checks were returned as dishonored, the banks would accept new NSF checks to replace them. This process would continue until the defendants decided to pay with "good" checks. In order to conceal this "float" scheme, officers of both banks had to make false entries on the books to avoid arousing the suspicions of bank examiners. This scheme allowed the Tropicana and P & L to continue day-to-day operations in spite of severe cash flow shortages.

During the trial, the government produced evidence that Marlee, Inc., a Nevada corporation that owned the Gamblers Hall of Fame casino, opened a checking account at Summit Richfield in July of 1975. Gustafson owned Marlee, Inc. The opening deposit was a $300,000 personal check of Ed Legg drawn on a Las Vegas bank. Prior to collection, the bank had paid $169,000 of checks written on the account. The Legg check was not collected as payment was stopped, thus, a $169,000 overdraft was created in the account. Two days later, Gustafson deposited a check drawn on an Ethiopian bank which was valued at approximately $300,000. The item was sent to a Minneapolis bank for collection. However, on the same day, Summit Richfield gave the Marlee account a $300,000 credit which covered the overdraft. On September 16, 1975, the foreign check was still uncollected and Gustafson assured the board of directors that he would personally pay the overdraft by September 30 if the check did not clear. The overdraft was paid by Gustafson on that date.

After the bank was examined in 1975, Chief Examiner Joseph Vogel wrote a letter to the board of directors at Summit Richfield dated December 1, 1975. The letter characterized the Marlee transaction as a "direct misapplication of bank funds" with attendant "fictitious entries" on the bank's books. It named Gustafson, Newstrum, and Bruins as the persons responsible and stated that reports had been submitted to the United States attorney and the FBI. Bruins responded to the letter and indicated that he and Gustafson were concerned but felt that they handled the situation properly. No charges were filed. The Vogel letter, government exhibit 500, was introduced at trial as evidence which tended to show the defendants had knowledge and notice that suspicious "floating" activity had occurred at the bank and was deemed a misapplication of funds by the bank examiners.

The testimony of trial witnesses established that by the spring of 1978, there were so many checks and replacement checks in the clearing process that the handling of such checks became almost impossible. Agosto ordered his people to consolidate 17 Tropicana checks into two checks, payable to P & L, in the amounts of $660,000 and $360,000, respectively. These checks were

deposited into the P & L account at Summit Richfield. When these checks were dishonored by the Valley Bank of Nevada, the Marquette National Bank of Minneapolis, Summit Richfield's correspondent bank, became quite alarmed. By May 16, 1978, the Marquette Bank had refused to extend provisional credit to Summit until those deposits had been collected.

This precipitated a crisis for the Summit Banks and led to what was labeled the "Jane Lannin Affair" at trial. Bruins telephoned Gustafson to inform him of the problem created by the Marquette Bank. Gustafson summoned Newstrum and put Bruins' call on a speaker phone. Bruins suggested that the Tropicana open new accounts at other Summit Banks which did not clear through the Marquette Bank. Newstrum was ordered to call Las Vegas and have blank Tropicana checks sent to Minnesota and delivered to Bruins. Newstrum called Jane Lannin and told her to drive to the Minneapolis Airport, pick up a speed pack from the Tropicana, deliver it to Bruins and await further instructions. When Lannin arrived at the bank, Bruins instructed her to open new accounts at two other Summit Banks in the name of Hotel Conquistador, Inc. When Lannin opened the new accounts, she drew checks payable to Summit National as directed by Bruins. The plan never achieved its desired effect because the bank examiners entered the bank before the checks could be presented for collection. Newstrum testified that Gustafson told him to lie to the FBI about the "Jane Lannin Affair" and to shift the responsibility from Minnesota to the people in Las Vegas.

On Monday, May 22, 1978, the federal bank examiners entered Summit National and Summit Richfield and discovered that $2,400,000 worth of checks were in float. Since this exceeded the capital of the bank, there was concern that the bank would fail. Gustafson borrowed $1,500,000 from a local bank to pay off floating checks. Agosto, through wire transfers, was able to pay off all but $220,000 at Summit National and $141,000 at Summit Richfield.

It appears that after the above payments were made, Gustafson and Bacigalupo set about to try to cover the remaining deficiency. On June 21, 1978, two miscellaneous credit slips to the P & L account were filed showing cash deposits of $110,000 and $109,000, respectively. These slips bore the initials of Bacigalupo as the responsible bank official. No currency transaction reports were filed. Furthermore, suspicious loans had been made earlier in the same day. These transactions are the subject of a second indictment in which Bacigalupo and Gustafson were charged with failure to file currency reports and for false entries on bank books. That case had not been tried prior to the trial of the instant case.

## II. Evidence of Other Crimes, Wrongs or Acts

Government exhibit 500, the letter of Chief Bank Examiner Vogel, was admitted into evidence and went to the jury. Appellants assert that the admission of such evidence was an abuse of Rule 404(b) of the Federal Rules of Evidence.[3] Appellants contend that the government introduced this evidence to show that they had a propensity towards criminal behavior. Under Rule 404(b), such evidence is not admissible to prove the bad character of the defendant, but may be admissible for other purposes, such as proof of motive, knowledge, or intent. *United States v. Goehring*, 585 F.2d 371, 372 (8th Cir.1978).

The standards in this circuit for the admission of other wrongs or acts evidence for such purposes are well established:

Our cases reveal certain requirements which must be met for other crimes evi-

---

**3.** Rule 404(b) reads as follows:

    **(b) Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

dence to be admissible under the rule: (1) a material issue on which other crimes evidence may be admissible has been raised, *e.g., United States v. Drury,* 582 F.2d 1181, 1184 (8th Cir.1978); *United States v. Maestas,* 554 F.2d 834, 837 (8th Cir.), *cert. denied,* 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1070 (1977); (2) the proffered evidence is relevant to that issue, *ibid.;* (3) the evidence of the other crimes is clear and convincing, *e.g., United States v. Cobb,* 588 F.2d 607, 612 (8th Cir.1978), *cert. denied,* [440 U.S. 947], 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979); *United States v. Drury, supra,* 582 F.2d at 1184; *United States v. Davis,* 551 F.2d 233, 234 (8th Cir.), *cert. denied,* 431 U.S. 923, 97 S.Ct. 2197, 53 L.Ed.2d 237 (1977). In addition, to be admissible on such issues as intent, knowledge, or plan, the other crimes evidence must relate to wrongdoing "similar in kind and reasonably close in time to the charge at trial." *United States v. Drury, supra,* 582 F.2d at 1184. *See, e.g., United States v. Little,* 562 F.2d 578, 581 (8th Cir.1977); *United States v. Jardan,* 552 F.2d 216, 219 (8th Cir.), *cert. denied,* 433 U.S. 912, 97 S.Ct. 2982, 53 L.Ed.2d 1097 (1977). Finally, evidence otherwise admissible under Rule 404(b) may be excluded under Fed.R.Evid. 403, "if its probative value is substantially outweighed by the danger of unfair prejudice * * *."

*United States v. Burchinal,* 657 F.2d 985, 993 (8th Cir.), *cert. denied,* 454 U.S. 1086, 102 S.Ct. 646, 70 L.Ed.2d 622 (1981) *quoting United States v. Frederickson,* 601 F.2d 1358, 1365 (8th Cir.), *cert. denied,* 444 U.S. 934, 100 S.Ct. 281, 62 L.Ed.2d 193 (1979).

Rule 404(b) is one of inclusion because it allows the admission of evidence of other crimes, wrongs or acts relevant to an issue in the trial, unless it tends only to prove criminal disposition. *United States v. Wagoner,* 713 F.2d 1371, 1375 (8th Cir.1983). The trial court is vested with broad discretion in deciding whether to admit wrongful act evidence. *United States v. Evans,* 697 F.2d 240, 248 (8th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 1779, 76 L.Ed.2d 352 (1983). The decision to admit such evidence will only be reversed when it is clear that the questioned evidence has no bearing upon any of the issues involved at trial. *United States v. Marshall,* 683 F.2d 1212, 1215 (8th Cir.1982).

In the present case, we find that all of the standards for admission were met; thus, the trial court did not abuse its discretion. At trial, a material issue on which evidence of other acts may be admissible was raised when the appellants' defense consisted of claiming they were innocent because they relied on their subordinates to handle these day-to-day transactions. Furthermore, government exhibit 500 is relevant to that issue. Evidence is relevant when it serves to rebut a defense that a person had justifiably relied upon subordinates to handle business matters. *See United States v. Park,* 421 U.S. 658, 678, 95 S.Ct. 1903, 1914, 44 L.Ed.2d 489 (1975).

We also find that the evidence of other acts was clear and convincing. To meet the clear and convincing standard, the proffered evidence cannot be admitted if it is of vague and uncertain character. *United States v. Clemons,* 503 F.2d 486, 490 (8th Cir.1974). Furthermore, the prior conduct cannot be equally consistent with an innocent explanation. *Id.* The uncontradicted evidence showed that the Ethiopian check was treated as a cash item and credited to Gustafson's account on the same day it was sent to Minneapolis for collection. Additional checks were then written on the account after it was given credit and prior to collection. We find it clear that an improper "float" occurred due to the bank giving credit to Gustafson's account. Under this same analysis, we find that the evidence related to wrongdoing similar in kind and reasonably close in time to the charge at trial.

Finally, we find that the evidence was properly admitted because its probative value was substantially outweighed by the danger of unfair prejudice. This court would find it quite difficult to rule that the admission of government exhibit 500 caused the appellants to be convicted on an im-

proper basis. Moreover, the trial court gave a limiting instruction telling the jury not to consider such evidence as substantive proof but only as proof of notice or knowledge of a prior incident. Such an instruction diminishes the danger of any unfair prejudice arising from the admission of evidence of other acts. *United States v. Goehring, supra,* 585 F.2d at 373.

### III. Bruins' Motion for a New Trial

Bruins asserts that because Gustafson and Agosto agreed, after trial, to give information to the government in exchange for a more lenient sentence, newly discovered evidence now exists that would justify granting him a new trial. Bruins submits that now Gustafson and Agosto would not try to implicate him in their crime and their testimony would be much more credible as they are now "on the government's side." Bruins argues that since this was unavailable during the first trial, it constitutes newly discovered evidence.

■■■ This court has set forth the criteria for granting a motion for a new trial on the ground of newly discovered evidence on numerous occasions. Before such a motion can be granted, the following five criteria must be met:

> (1) the evidence must be in fact newly discovered, that is, discovered since the trial; (2) facts must be alleged from which the court may infer diligence on the part of the movant; (3) the evidence relied upon must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) it must be of such nature that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Swarek,* 677 F.2d 41, 43 (8th Cir.1982), *cert. denied,* 459 U.S. 1102, 103 S.Ct. 723, 74 L.Ed.2d 949 (1983). It is also well settled that such motions are looked upon with disfavor and we will not overturn the trial court's decision absent a clear abuse of discretion. *United States v. Pope,* 415 F.2d 685 (8th Cir.1969), *cert. denied,* 397 U.S. 950, 90 S.Ct. 973, 25 L.Ed.2d 132 (1970).

■■ We find that the showing made in support of the motion for new trial does not satisfy the criteria set out in *Swarek.* The court did not abuse its discretion in denying the motion.

### IV. Gustafson's Motion in Limine

■■ At the close of the government's case, the court granted a judgment of acquittal to Bacigalupo. As he was available as a witness, Gustafson announced his intention to call Bacigalupo to testify for the defense. The government advised that, if Bacigalupo was called, its cross-examination would include the subject matter of the second indictment pending against Bacigalupo and Gustafson. Gustafson made a motion in limine requesting that the government not be allowed to broach the second indictment in cross-examination. The trial court refused to rule in advance on the motion and Gustafson chose not to call Bacigalupo to the stand.

Gustafson asserts that this court's decision in *United States v. Burkhead,* 646 F.2d 1283 (8th Cir.), *cert. denied,* 454 U.S. 898, 102 S.Ct. 399, 70 L.Ed.2d 214 (1981), compels a finding of reversible error. We disagree. In *Burkhead,* the court found reversible error when a trial court failed to rule in advance on whether a defendant could be cross-examined regarding events underlying his conviction on severed substantive counts as it was determinative of his desire to take the stand. We find that Gustafson's reliance on *Burkhead* is misplaced. The court in *Burkhead* held that in the usual case the judge has discretion to refuse to rule in advance, however, this case was so outside the ordinary that a refusal to rule in advance on a matter determinative of the defendant's desire to take the stand constituted an abuse of discretion. *Id.* at 1285. Thus, *Burkhead* is the exception and the instant case is covered by the general rule. The court did not abuse its discretion.

### V. Conclusion

For the foregoing reasons, the convictions are affirmed.