UNITED STATES of America, Appellee,

v.

James Davis CALLAWAY, Appellant.

No. 90–2671.

United States Court of Appeals,
Eighth Circuit.

Submitted April 10, 1991.

Decided July 16, 1991.

Arthur L. Allen, Little Rock, Ark., for appellant.

Robert J. Govar, Little Rock, Ark., for appellee.

Before BOWMAN, Circuit Judge, and HENLEY and FRIEDMAN,* Senior Circuit Judges.

FRIEDMAN, Senior Circuit Judge.

The appellant, Callaway, challenges his conviction for knowingly transferring a firearm knowing it would be used to commit a crime of violence, in violation of 18 U.S.C. § 924(g) (1988), on the grounds that (1) the statute does not cover his conduct and (2) the district court improperly (a) admitted evidence of Callaway's other crimes and prior bad acts and (b) permitted the prosecution to cross-examine him about his involvement in other robberies and thefts. We affirm.

## I.

After a jury trial in the United States District Court for the Eastern District of Arkansas (Chief Judge Eisele), Callaway was convicted under a single-count indictment charging that, on or about July 20, 1989, he knowingly transferred a sawed-off shotgun, knowing that the weapon would be used in a crime of violence, namely, an armed robbery of a residence, in violation of 18 U.S.C. § 924(g). He was sentenced to 96 months imprisonment.

There was evidence from which the jury could have found:

A few weeks prior to July 20, 1989, Callaway asked his step-brother, Mullins, who Callaway knew was having financial problems, whether Mullins would be interested in robbing a crap game. Mullins initially rejected the proposal, but later agreed after his financial problems had worsened. Mullins and Callaway had participated in the robbery of a dice game about a year before.

Approximately one week before the planned date of the robbery (July 20, 1989), Callaway called Everett Vanderburg to see if he had a gun. Callaway told Vanderburg that Mullins "wanted a gun for protection against his kinfolks, ... [s]ome of them break in on him." Later that same night, Callaway, Mullins, and another person drove to the residence of Vanderburg. Vanderburg gave Callaway a sawed-off shotgun, for which Callaway paid him $15.00. Callaway gave the shotgun to Mullins, who placed it in his truck.

On the evening of the anticipated robbery, Callaway, Mullins, and five others met at Callaway's home. Callaway outlined the plan for the robbery, made a sketch of the trailer where the dice game was to take place and of its location, and pointed out that there would be only one gun inside the trailer. The sawed-off shotgun Callaway had purchased from Vanderburg and two other guns were provided for use in the robbery. The three persons who were going to commit the robbery were supplied with rubber gloves to wear, nylon stockings for masks and rope with which to tie up the participants in the crap game. Mullins was to drive the car. Callaway, according to Mullins, "put [the robbery] together."

When the robbers reached the trailer where the crap game was supposed to take place, they were unable to gain entrance to it through the ruse they used. They attempted to shoot open the trailer door, but shots were fired from inside the trailer that killed one of the robbers. The two other robbers and Mullins then fled.

## II.

Section 924(g) of Title 18 provides: Whoever knowingly transfers a firearm, knowing that such firearm will be used to commit a crime of violence (as defined in subsection (c)(3)) or drug trafficking crime (as defined in subsection (c)(2)) shall be imprisoned not more than 10

---

* Daniel M. Friedman, of the United States Court of Appeals for the Federal Circuit, sitting by designation.

years, fined in accordance with this title, or both.

Subsection (c)(3) defines "crime of violence" as a felony that:

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

The statute does not define "transfer" and apparently this is a case of first impression regarding the meaning of that term in § 924(g).

Callaway argues that the appropriate definition of "transfer" under this section is the standard this court and the Ninth Circuit applied in determining that there had not been a transfer of a firearm under the National Firearms Act, 26 U.S.C. §§ 5801 *et seq.*, in *United States v. Kiefer*, 694 F.2d 1109 (8th Cir.1982) and *United States v. Hurd*, 642 F.2d 1179 (9th Cir. 1981). In *Kiefer*, the court set aside Kiefer's conviction under two counts where the events showed that Stewart, the owner of the gun shop where the firearms were purchased, actually made the transfers and Kiefer merely had temporary possession of the guns. The court reasoned that the "plain implication" of the definition of "transfer" in the Firearms Act was that "a transferor is one controlling the ultimate disposition of the weapons, not a person without such control performing the simple act of physically handing the guns to another." *Kiefer*, 694 F.2d at 1114. The court quoted with approval the statement in *Hurd* that "an element" of the statutory definition of "transfer" in the Firearms Act was that "the alleged transferor surrenders control or dominion over the weapons." *Hurd*, 642 F.2d at 1182.

As the court pointed out in *Kiefer*, "[u]nder the Firearms Act, the transfer of a weapon is unlawful if the transfer tax is not paid, an application is not filed, or the application fails to include all required information." *Kiefer*, 694 F.2d at 1114. The

court concluded: "Moreover, Congress, by requiring payment of a tax and registration of the transfer, clearly intended to require that a transferor have more of a proprietary interest in the weapon than just the mere transitory physical possession of it." *Id.*

Unlike the Firearms Act, § 924(g) does not seek to regulate firearms transactions by requiring the filing of an application and the payment of a transfer tax. Section 924(g) makes criminal the knowing transfer of a firearm that the transferor knows will be used to commit a crime of violence. This provision, which was part of the Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, § 6211, 102 Stat. 4359 (1988), was designed to curb the supply of firearms used in the commission of drug-related and violent crimes.

The reach of the provision is broad—it covers "whoever" knowingly transfers a firearm knowing of its proposed illegal use. To read into this broad language the limitation that the courts have read into the term "transfer" in the significantly different Firearms Act would defeat the purpose of § 924(g) of stopping the transfer of firearms used to commit drug-related and violent crimes. "[T]he fact that Congress may have used the term ['transfer'] in a different sense in legislation having a different purpose cannot control our interpretation of the [same] language in this Act...." *McCarthy v. Bronson*, —— U.S. ——, ——, 111 S.Ct. 1737, 1742, 114 L.Ed.2d 194 (1991).

The action of Callaway shown by the record in this case is the very kind of activity that § 924(g) was intended to cover. Callaway purchased the sawed-off shotgun from Vanderburg to be used in the robbery, which was turned over to the robbers for that purpose. He planned the robbery and worked out its details, which he gave to the robbers. The robbers were provided not only with the firearms but also with other articles for them to use in committing the robbery: rubber gloves to wear, nylon stockings to use as masks, and rope with which to tie up the participants in the crap game they were planning to rob.

Finally, he pointed out there would be only one gun inside the trailer.

There can be no doubt that Callaway knowingly transferred a firearm (the sawed-off shotgun) knowing that it would be used to commit a crime of violence (armed robbery of a crap game taking place in a trailer). The evidence fully supports Callaway's conviction of violating § 924(g).

### III.

■ During his direct examination, Mullins testified that about a year before the robbery involved in this case, he, Callaway, and others had participated in an armed robbery of another dice game in the same town. No objection was made to the first fifteen questions relating to the prior robbery, but then Callaway's counsel moved for a mistrial because of the testimony. The district court overruled the objection, holding that the evidence "seems to tie in to the reason for his being involved in the second [robbery] you are concerned about. It explains the relationship between the defendant and this witness. It has some prejudicial effect, but I think it's well within the bounds of relevance and the Government is entitled to bring it out." The government then further questioned Mullins about the prior robbery.

Callaway argues that the introduction of this evidence violated Rule 404(b) of the Federal Rules of Evidence, and that the district court therefore erred in denying his motion for a mistrial. Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The test in this circuit for admission of other act evidence under Rule 404(b) requires a showing that:

(1) the evidence of the other act must be relevant to a material issue; (2) the other act must be similar in kind and reasonably close in time to the crime charged; (3) the evidence of the other act must be clear and convincing; and (4) the probative value of the evidence must not be outweighed by its prejudice.

*United States v. Estabrook,* 774 F.2d 284, 287 (8th Cir.1985) (quoting *United States v. Gustafson,* 728 F.2d 1078, 1083 (8th Cir.) *cert. denied,* 469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984)). Moreover, this circuit views Rule 404(b) "as one of inclusion, permitting admission of other crimes, wrongs, or bad acts material to an issue at trial, unless the evidence tends to prove only the defendant's criminal disposition." *Estabrook,* 774 F.2d at 287. Finally, "[t]he trial court is vested with broad discretion in determining whether to admit wrongful act evidence. The trial court's determination will not be disturbed unless the appellant can show that the evidence in question clearly had no bearing upon any of the issues involved." *Id.* (citations omitted).

The district court did not abuse its discretion in admitting the evidence. The evidence met the four point test of *Estabrook.*

(1) It was relevant to a material issue in the case: whether Callaway knew the shotgun would be used to commit a crime of violence or, as Vanderburg's testimony suggested, whether Callaway purchased and transferred the weapon for other purposes, i.e., Mullins' protection. "Knowledge" is one of the specific grounds upon which Rule 404(b) permits the introduction of other crimes evidence. (2) The prior robbery was the same kind of offense (armed robbery of a crap game) and reasonably close in time to the offense charged (approximately a year earlier). (3) The evidence of the prior crime was clear and convincing, since it was "[d]irect testimony of the defendant's participation in the prior transaction...." *Llach v. United States,* 739 F.2d 1322, 1327 (8th Cir.1984) (citing *United States v. Evans,* 697 F.2d 240, 248 (8th Cir.), *cert. denied,* 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 350 (1983)). (4) Finally, the district court did not err in concluding, as it implicitly did, that the relevancy of the evidence was not outweighed by its prejudice.

This evidence did far more than merely "tend[ ] to prove only the defendant's crimi-

nal disposition." *Estabrook*, 774 F.2d at 287. It showed not only the defendant's knowledge of the use to which the gun would be put, but his planning of the crime, the preparations for its commission, and his relationship with Mullins. The district court did not abuse its discretion in denying a mistrial. *Cf. United States v. Muza*, 788 F.2d 1309, 1312 (8th Cir.1986).

## IV.

■ Callaway testified in his own defense. Early in his testimony, he was asked: "Have you been involved in any robberies?" He answered: "No, sir."

Prior to beginning cross-examination, the prosecutor told the court at a bench conference that he proposed to question Callaway about a 1972 conviction for grand larceny and escape. Callaway's lawyer objected that "[t]hat is not a robbery charge ... [i]t's just a simple theft." The prosecutor stated that "If you say, 'I have never been involved in a robbery,' that indicates that you have never been involved in stealing anything." Callaway's lawyer replied "No. No it doesn't. Robbery and theft are totally different."

The court stated that what Callaway said "in response to his own lawyer's question ... leaves the impression that he's never been involved in such conduct such as robbery or theft. I believe that's the way it would come across to the jury." The court stated that it would permit the prosecutor to ask Callaway if he were involved in any theft of property, because "the jury is entitled to a better understanding of his prior answer in the light of this record...."

The prosecutor asked Callaway whether he had "ever been involved in the theft of property." Callaway responded "Maybe back when I was younger," and answered "yes" to the question "Well, how about 1972, grand larceny?" Callaway admitted that he had been "[f]ound guilty of grand larceny" and received a seven year suspended sentence. At that time he was nineteen years old.

In response to the question "Were you involved in any other thefts of property?" Callaway replied: "I—at one time other—it

was a deal with Tony [Mullins]. I moved a refrigerator and was charged with theft by receiving, I believe." He was then asked whether he was "involved in the thefts of any other property," and answered "no" to both that question and the next question, "How about in 1969 in Hot Springs, Arkansas?"

Callaway's lawyer then moved for a mistrial on the ground that "[the prosecutor] is going back into a record on a 17 year old boy that has nothing more than to show that he was stopped and a report was made. There was no indication a charge was ever filed or anything else on this. This far goes beyond any kind of impeachment. The man admitted everything."

The court denied a mistrial, explaining that it permitted this line of questioning to show "[n]ot [Callaway's] record but whether he is in fact telling the truth about his prior criminal conduct. Lying in a sense—broader sense of saying 'I have never been involved in any robbery.'"

Callaway argues that the evidence of his 1972 grand larceny conviction and other misdeeds was improperly admitted under Rules 608 and 609 of the Federal Rules of Evidence, and that the district court therefore erred in denying his motion for a mistrial.

Rule 608(b) permits a district court, in its discretion, to allow cross-examination on "[s]pecific instances of conduct of a witness, for the purpose of attacking or supporting the witness' credibility...." The district court has broad discretion "in setting the limits of cross-examination.... If a defendant takes the stand, his credibility is placed in issue, and the Government is entitled to attack it by cross-examination. Counsel should be given wide latitude in cross-examination." *United States v. Wallace*, 722 F.2d 415, 416 (8th Cir.1983) (citations omitted). *See also United States v. Hiland*, 909 F.2d 1114, 1132–33 (8th Cir. 1990).

The cross-examination to which Callaway objects was all engendered by his direct testimony that he had not "been involved in any robberies." The questions were designed to rebut that claim by showing that he had indeed been involved in other thefts

of property. The cross-examination, therefore, directly attacked the credibility of Callaway's denial of involvement in any robberies or thefts of property and as such was proper.

The fact that the 1972 conviction for grand larceny was more than ten years old did not bar its use in cross-examination. Although Rule 609 of the Federal Rules of Evidence generally makes inadmissible a conviction that is more than ten years old, such evidence is admissible if "the court determines, in the interests of justice, that the probative value of the conviction supported by the specific facts and circumstances substantially outweighs its prejudicial effect." Fed.R.Evid. 609(b). Considering all the circumstances, the district court did not abuse its discretion in permitting the prosecutor to ask Callaway about his involvement in prior robberies and thefts of property and his 1972 grand larceny conviction. In any event, even assuming *arguendo* that the question regarding the 1972 conviction was improper, in view of the strong evidence of guilt, any error in permitting it was harmless.

Callaway also argues that the prosecutor improperly cross-examined him about various alleged misdeeds. As Callaway recognizes, however, he did not object to those questions. None of these questions, individually or collectively, constituted plain error, and in the absence of any objection we decline to consider their propriety. *See* Fed.R.Crim.P. 51; *United States v. Helmel*, 769 F.2d 1306, 1317 (8th Cir.1985) ("It is well established that in order to preserve error for review, a timely and specific objection must be made in the trial court.").

The judgement of the district court is affirmed.