UNITED STATES of America, Appellee,

v.

**Sandy TOWNSLEY, Appellant.**

UNITED STATES of America, Appellee,

v.

**Ernest (Pat) GANDY, Appellant.**

UNITED STATES of America, Appellee,

v.

**Sorkis WEBBE, Jr., Appellant.**

**Nos. 86–1045, 86–1075, and 86–1188.**

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 13, 1987.

Decided March 25, 1988.

Richard L. Daly, St. Louis, Mo., for appellant Webbe.

Burton H. Shostak, Deborah J. Kerns, St. Louis, Mo., for appellant Gandy.

Irl Baris, St. Louis, Mo., for appellant Townsley.

James Crowe, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before ARNOLD and BOWMAN, Circuit Judges, and HENLEY, Senior Circuit Judge.

HENLEY, Senior Circuit Judge, authored the opinion of the court with the exception of part VI. A. which was written by ARNOLD, Circuit Judge. HENLEY, Senior Circuit Judge, writes separately in dissent from that portion of the court's opinion. BOWMAN, Circuit Judge, concurs in all but part V. of the court's opinion from which he dissents.

Appellants Sorkis Webbe, Jr. and Sandy Townsley were convicted following a jury trial on various conspiracy charges involving vote fraud, 18 U.S.C. § 241, mail fraud, 18 U.S.C. § 371, and obstruction of justice, 18 U.S.C. § 1503. Appellant Ernest (Pat) Gandy was convicted of mail fraud and obstruction of justice. Webbe [1] was sentenced by the district court to eleven years imprisonment and fined $10,000.00. Townsley and Gandy were each sentenced to three years in prison, three years probation, and fined $2,000.00.[2] This appeal followed. For reasons to be stated, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

The facts are myriad and byzantine. What follows is a summary of the essential scheme and other details necessary to place the case in context. Additional facts will be discussed throughout the remainder of this opinion as necessary.

In 1978 Sorkis Webbe, Jr. was the Democratic Committeeman for the Seventh Ward in St. Louis, Missouri. Webbe had strong ties with the Seventh Ward Regular Democratic Organization. In the 1978 Democratic primary the incumbent State Representative for the 83rd District,[3] John Leisure, was opposed by Edward Bushmeyer. John Leisure was supported by the Seventh Ward Regular Democratic Organization (hereafter Seventh Ward Organization) and by Webbe. Bushmeyer successfully challenged Leisure's candidacy on residency grounds and Leisure's name was removed from the ballot. The Seventh Ward Organization substituted another candidate, but he was ultimately defeated by 199 votes. Prior to removal of Leisure's name from the ballot, more than 250 absentee votes had been cast for him. Webbe was unsuccessful in a lawsuit which sought to re-vote those ballots and Bushmeyer went on to be elected State Representative (apparently the 83rd District is strongly Democrat and success in the Democratic primary virtually assures victory in the general election).

Control of the State Representative seat and other elective positions in the Seventh Ward was important to Webbe and his supporters because of the numerous city and state patronage jobs controlled by those in office. Webbe was determined to unseat Bushmeyer and convinced Robert Brandhorst to run in the 1980 Democratic primary. Although Brandhorst was supported by Webbe and the Seventh Ward Organization, he also maintained his own campaign organization.

As evidenced by the 1978 primary, Webbe knew that the absentee vote would be important to the outcome of the 1980 primary. The strength of the absentee vote was in part due to the sizeable elderly population of the Seventh Ward. Webbe

---

**1.** Webbe's father, Sorkis Webbe, Sr., was also named in the indictment, but he died before this case was brought to trial. Unless otherwise noted, Webbe will refer to Sorkis Webbe, Jr.

**2.** A fourth defendant, Norm Clark, was also convicted at the same trial, but he did not join in this appeal.

**3.** Seven of the eight precincts comprising Ward Seven are included in the 83rd District.

therefore determined to mount a strong campaign to solicit absentee votes. At that time Missouri law required absentee ballots to be notarized. Accordingly, the Seventh Ward Organization arranged for a number of its workers to become notaries.

Eugene (Buck) Jones was in charge of keeping records of the absentee ballots during the 1978 election. During that election Webbe invited Jones to his home and demonstrated to Jones how he was to instruct the workers to partially seal an absentee ballot so it could be opened at campaign headquarters and then resealed. The absentee ballots in Missouri during both the 1978 and 1980 primary elections were IBM computer cards which contained a series of perforated numbers that corresponded to the candidates on the ballot. Using a tool (which resembles a bent out paper clip), a voter would punch out the number that corresponded to the candidate for whom he or she wished to vote. No one other than the voter was to punch the ballot unless the voter requested assistance. The ballot was then supposed to be inserted into a transmittal envelope and the envelope was to be completely sealed and mailed to the Missouri Board of Election Commissioners. Only election officials were authorized to open the envelopes. The voter affidavit, which was to be signed by the voter and notarized, was printed on the outside of the transmittal envelope.

In the 1980 election Buck Jones was again helping Webbe coordinate his absentee voter efforts. During a meeting called by Webbe for new notaries at the Seventh Ward Organization headquarters, Buck Jones instructed notaries how to partially seal the ballot transmittal envelopes.[4] This procedure was questioned at the meeting and Webbe affirmed that the ballots were to be partially sealed so they could be

checked when returned to the Seventh Ward Organization headquarters.[5]

Another duty assumed by Buck Jones at the request of Webbe was to maintain a ledger of absentee ballots. Jones would obtain from the Board of Election Commissioners a daily list of absentee ballots that were sent out to voters. Jones would record in a column of the ledger that a ballot was sent out. Jones would then notify the precinct captains so that they could arrange to send a notary to the voter's residence. The notaries would bring any ballots they notarized, partially sealed, back to Jones who would place them in a locked drawer in his desk (Townsley and Webbe had access to this drawer). Jones would then make a notation in another column that the partially sealed ballot was received. Jones would check the ballot drawer daily. When the ballot was returned to the drawer fully sealed he would place a stamp on it and mail the ballot. He would then make a notation in a third column that the ballot had been mailed to the Board of Commissioners. Jones was the only person at the Seventh Ward Organization authorized to mail the ballots. Although Jones destroyed his records in 1981 after he disassociated himself from the Seventh Ward Organization, he testified that his records indicated that "quite often" ballots returned in a partially sealed state were never subsequently mailed.

On one occasion Wellington Hamilton Lemmer (a campaign worker for the Seventh Ward Organization and a confidential government informant) entered Webbe's office at the Seventh Ward Organization. Lemmer saw Webbe, Townsley (a close associate of Webbe, Jr. and an integral member of the Seventh Ward Organization) and two others with opened absentee ballots and observed that they were punching holes in the ballots. Townsley was chas-

---

**4.** The descriptions of what this entailed varied. Essentially, the notaries were instructed to lightly moisten a small area of the envelope flap and to press down upon it hard. The goal was to make it appear sealed to the voter when in actually it could be easily opened and resealed without appearing to have been violated when it ultimately was received by the election officials.

**5.** There was some variation in the testimony as to the exact substance and identity of the speakers. The central theme, however, was that Webbe wanted the ballots returned to the Seventh Ward Organization headquarters in a partially sealed state so that they could be examined.

tized for failing to lock the door; nonetheless Lemmer was allowed to remain and was told to "double-punch" in the Bushmeyer/Brandhorst race if Bushmeyer had received the vote.[6]

On another occasion Edward Tumminia (a friend of Webbe active in the 1980 race, Tumminia was named in the indictment but pleaded guilty prior to trial) was observed in Webbe's office with twenty to twenty-five open absentee ballots. When Tumminia saw he was being watched, he put the ballots in a bag and left the headquarters through a back door. Tumminia returned shortly and was not gone long enough to have deposited the ballots in the nearest mailbox.

Throughout the course of the campaign Townsley would be asked how the absentee vote was going. Townsley was able to respond with specific vote counts.

During the absentee ballot drive a disagreement arose between Webbe's campaign workers and Jim Shrewsbury, a worker for Bushmeyer. The disagreement involved the solicitation of persons who had received absentee ballots who resided in a housing project located in the Seventh Ward. Lemmer returned to the Seventh Ward Organization headquarters to report the incident. Webbe, Sr. (Webbe, Jr. was also present) became angry and sent Norm Clark and Pat Gandy back to the housing project with Lemmer. Lemmer was to point out Shrewsbury to Clark and Gandy who would "take care of him." Lemmer pointed Shrewsbury out to Clark and Gandy. As Lemmer left with Townsley he heard a scream and turned around to see Shrewsbury slumped on the ground. Lemmer saw Gandy and Clark standing behind Shrewsbury and Gandy put a blackjack in the band of his trousers. Later, Lemmer was told by Webbe, Sr. in the presence of Townsley to tell the police the incident appeared to be a mugging.

Ultimately Brandhorst defeated Bushmeyer in the primary and went on to win the general election. Although Brandhorst

lost at the polls by four votes (Bushmeyer 1516; Brandhorst 1512), he won the election on the strength of the absentee vote (Bushmeyer 141; Brandhorst 306). Out of the total absentee ballots sent out in the City of St. Louis (6071), 653 were not returned. This figure was not broken down into wards.

During his term as State Representative, Brandhorst had a falling out with Webbe. In the 1982 Democratic primary Webbe backed another man for State Representative and Brandhorst was defeated in the primary.

On March 9, 1983 the FBI began serving grand jury subpoenas on members of the Seventh Ward Organization. The Webbes' offices at the Mayfair Hotel were under electronic surveillance pursuant to a court order issued in an unrelated investigation. The conversations recorded in this surveillance buttressed the government's vote fraud case and formed the basis of the obstruction of justice charge in the indictment.

After the subpoenas were served, Webbe quickly surmised that the government was investigating vote fraud allegations in the 1980 primary and, in particular, fraud involving absentee ballots. The following is from a March 9 conversation:

Webbe, Jr.: One thing I'm gonna tell you so you know ... two things ... first, whenever we had a precinct captain meeting (inaudible) I told them how to do it.

Webbe, Sr.: All the precincts ...

Webbe, Jr.: ... just my notaries.

Webbe, Sr.: ... you didn't tell 'em to do anything illegal? ... What did you tell them?

Webbe, Jr.: ... unseal the ballots bring them to me.

In another conversation the following day Webbe stated:

Webbe, Jr.: That I told them ... take the envelope, go like this, and bring it to me ... (inaudible) on every ballot

---

6. Double-punching would result in no vote being tallied for that particular race, thus nullifying a vote that had been cast for Bushmeyer.

This practice, however, would not affect any other races voted on in the ballot.

... I used to rip up the ones that were....

In a conversation in which Townsley is concerned that another campaign worker is going to testify against her, Townsley implicates herself in the absentee vote fraud:

Townsley: ... y'know he did not actually see us do anything, so he can't say he saw anybody. He knows he brought the ballot to me and he knows what I did with it....

The evidence from the electronic surveillance regarding the obstruction of the grand jury investigation is legion. Webbe was housing Gandy at the Mayfair Hotel in order to avoid being questioned by the police. The sessions held by Webbe, Jr. and Webbe, Sr. with the various witnesses expected to be called by the grand jury can only be characterized as coaching them to present a unified, fabricated front. No useful purpose would be served in setting out even a truncated version of this witness "wood shedding."

Webbe, Townsley, Gandy and Clark were subsequently indicted by the grand jury, tried together by a jury, and convicted. All but Clark appeal.

## II. ELECTRONIC SURVEILLANCE

At the defendants' trial the government introduced evidence that had been obtained through electronic surveillance of oral communications had in the Mayfair Hotel offices of Sorkis Webbe, Sr. and Sorkis Webbe, Jr. The district court had authorized the electronic surveillance pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968. 18 U.S.C. §§ 2510–2520. Defendants' pretrial motion to suppress the electronic surveillance evidence was denied. On appeal defendants challenge the sufficiency of the affidavit in support of the application for electronic surveillance, the government's surreptitious acquisition of the keys to the Mayfair offices prior to the court order authorizing surveillance, and the necessity for electronic surveillance.

Until recently the Supreme Court had utilized what had been called the *Aguilar–Spinelli*[7] two-pronged test in determining the trustworthiness of hearsay. *Aguilar–Spinelli* required that the affidavit set forth the basis of the informant's knowledge (the first prong) and establish the veracity of the informant (the second prong). *Aguilar*, 378 U.S. at 114–15, 84 S.Ct. at 1513; *United States v. Button*, 653 F.2d 319, 322 (8th Cir.1981). The veracity prong may be satisfied either by the informant's inherent credibility or by his past proven reliability. *Button*, 653 F.2d at 322 n. 4. A failure on either prong would result in a determination that the affidavit was insufficient to support a finding of probable cause. *See Illinois v. Gates*, 462 U.S. 213, 228–31, 231 n. 5, 103 S.Ct. 2317, 2326–28, 2328 n. 5, 76 L.Ed.2d 527 (1983) (criticizing lower courts' independent treatment of the two prongs).

■ *Gates* abandoned the two-pronged test, *id.* at 238, 103 S.Ct. at 2332, for a more nebulous "totality of the circumstances" approach. *Id.* "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that ... evidence of a crime will be found in a particular place." *Id.* at 238, 103 S.Ct. at 2332. *Gates* concerned the issuing of a search warrant under the fourth amendment; however, the probable cause showing necessary for an order authorizing electronic surveillance is no different. *United States v. Talbert*, 706 F.2d 464, 467 (4th Cir.1983). The defendants have urged this court to conduct a punctilious paragraph-by-paragraph dissection of the supporting affidavit. That is not our standard of review. "[A]fter-the-fact scrutiny by the court of the sufficiency of an affidavit should not take the form of *de novo* review." *Gates*, 462 U.S. at 236, 103 S.Ct. at 2331. Our inquiry is limited to whether the issuing magistrate had a "sub-

---

7. *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), *both overruled in Illinois v. Gates,* 462 U.S. 213, 239, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).

stantial basis" for his decision. *Id.* We now turn to the allegations in the affidavit.

The request for electronic surveillance of Webbe's office at the Mayfair Hotel stemmed not from allegations of vote fraud, but from a broader investigation into organized crime in St. Louis. The impetus for the investigation was a series of retaliatory killings, car bombings, and assaults between rival organized crime families.

In 1964 Paul John Leisure (Paul Leisure) was associated with the head of the Syrian organized crime family in St. Louis, Anthony Michaels, Sr. That year Paul Leisure's cousin was killed in a tavern fight. Under directions from Michaels, Sr., George Faheen, Sr. pressured the tavern owner to recant his identification of the killers. This coverup was unknown to Paul Leisure and he and Anthony Leisure continued to work for Michaels, Sr. as bodyguards. In 1968 the Leisures became aware of the coverup and aligned themselves with the Italian organized crime family in St. Louis headed by Anthony Giordano.

Paul Leisure, together with Raymond Flynn, Anthony Leisure, David Leisure, James Earl Miller and Ray Simon were principals in a burglary ring which operated in several states. David Leisure and Michael Kornhardt were arrested for possession of burglary tools and David Leisure has been arrested on two other occasions for burglary offenses.

In 1979 John Spica, an associate of Giordano, was sponsored by Giordano for membership in a local union then controlled by Flynn. Spica and Flynn had a heated argument on at least one occasion. Spica was subsequently killed in a car bombing. Stanley Kowalski had made and installed the bomb and Giordano determined that Flynn was responsible for the bombing. Giordano began to plan Flynn's demise, but Giordano died in August, 1980 before any action was taken.

Sometime thereafter Flynn introduced Paul Leisure to Kowalski, and Paul Leisure paid Kowalski to place a bomb in Michaels, Sr.'s car. In June, 1980 Michaels, Sr. was killed in a car bomb explosion. Paul Leisure had not acted earlier against Michaels, Sr. because Giordano did not want a war between the two groups. Paul Leisure had a remote starter installed in his car to thwart any retaliation for Michaels, Sr.'s death.

Webbe, Jr., while not implicated in the Michaels, Sr. bombing, acknowledged that he owed Paul Leisure a political debt for the killing. Michaels, Sr. had previously controlled the St. Louis Seventh Ward aldermanic seat and with his death Webbe, Jr. faced lessened political opposition for the seat. Webbe, Sr., an attorney, has been characterized as a "consigliere" or trusted confidant and advisor to Paul Leisure.

In August, 1980 Paul Leisure was severely injured in a car bomb explosion. Implicated in the bombing were Norman Peters, James Anthony Michaels, III, Jack Issa, Robert Peters, George "Sonny" Faheen and Dennis Day. In September, John Charles Michaels (brother of James Anthony Michaels, III) and Dennis Day were victims of a shotgun assault by Anthony and David Leisure. During this period Paul Leisure had relatives who worked with the Missouri Department of Revenue and who supplied him with vehicle registration information. In October, 1981 Faheen was killed in a car bomb explosion. Kornhardt was arrested in connection with Faheen's murder in November. Webbe, Jr. made inquiries of jail officials as to whether Kornhardt had talked to police. Kornhardt was released from jail on bond and was subsequently found shot to death. The Leisures were implicated in his murder.

In January, 1982 Webbe, Sr. spoke with Paul Leisure to offer to mediate a truce between the Leisures and Michaels. A meeting was scheduled but had to be rescheduled. The Leisures continued to seek the other persons involved in Paul Leisure's bombing. In intercepted conversations, Jeffrey Aboussie, who is associated with a Kansas City, Missouri organized crime family, offered to aid the Leisure group in locating James A. Michaels, III by contacting the Denver and Chicago orga-

nized crime families. In an August, 1982 intercepted conversation between Webbe, Jr. and Paul Leisure, Webbe stated, "they're in Colorado, no question about it." Surveillance by the FBI indicated that James A. Michaels, III had resided in Colorado since the Paul Leisure bombing. Michaels was ultimately indicted for the car bombing of Paul Leisure. In an intercepted conversation with Webbe, Jr. Paul Leisure said Michaels' prosecution would not alter his plans for revenge.

Fred Prater, a twenty-year associate and business partner of Paul Leisure, testifying before the grand jury on grant of immunity, implicated himself, Paul Leisure, Anthony Leisure, David Leisure and others in the death of Michaels, Sr. Prater implicated himself, Anthony Leisure, David Leisure and others in a shotgun attack on John Charles Michaels and Day. Prater implicated Anthony Leisure, David Leisure, Kornhardt and others in the bombing death of Faheen. Finally, Prater implicated Paul Leisure, Anthony Leisure, David Leisure and others in the death of Kornhardt.

Prater's grand jury testimony was given on August 19, 1982. On August 16 and 17 conversations were intercepted between Paul Leisure and others concerning Prater's absence from work and the inability to locate him. On August 19 Prater's attorney advised Paul Leisure that Prater had discharged him and he assumed Prater was going to testify before the grand jury. Shortly thereafter Paul Leisure called Webbe, Sr. at the Mayfair Hotel to tell him about Prater. Webbe, Sr. asked Leisure if he had "told everybody else." Webbe, Sr. called Leisure later that evening to get an update on Prater.

Webbe, Sr. also had difficulties with the Detroit organized crime family arising out of Webbe's sale of the Aladdin Hotel in Las Vegas. The Detroit group believed that Webbe owed them money which they had loaned Webbe for the purchase of the Aladdin. The Detroit group also wanted to buy into Webbe, Sr.'s ownership of a casino in the Bahamas. Webbe refused. Webbe, Sr. wanted Paul Leisure "in his corner" if the "Italians" decided to cause trouble.

■ Much of the information contained in the affidavits was obtained from prior electronic surveillances authorized by the court. Many of the monitored conversations indicated that those under investigation suspected the existence of electronic surveillance. Webbe, Sr. also displayed caution with regard to electronic surveillance by asking Paul Leisure on several occasions what phone he was calling from and by making reference to the attorney/client privilege in some conversations. The murder of Kornhardt and the implication of the Leisures in the death is indicative of the lengths to which they would go to prevent others from talking. All these factors support the government's allegation that normal investigatory techniques were unsuccessful. *See United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974).

In telephone conversations between the Webbes and Leisure substantive matters were not usually discussed. Quite frequently they would arrange to meet in the Webbes' offices in the Mayfair Hotel to discuss matters. Thus, the affidavit provided probable cause to believe that evidence of a crime would be found in conversations intercepted at those offices.

The defendants attack the credibility of the confidential sources providing information in the government's affidavit in support of its request for electronic surveillance, and the fact that those sources often obtained their information from persons only identified as "friends," "associates," and other "LCN members." [8] *See United States v. Smith*, 462 F.2d 456, 459 (8th Cir.1972) (double hearsay may form the basis of probable cause determination); 1 W. LaFave *Search and Seizure* § 3.2(d), at 579–80 (2d ed. 1987). We have thoroughly reviewed the entirety of the affidavit, including the twelve other affidavits that are incorporated by reference, and conclude

---

**8.** "LCN" is an acronym for la cosa nostra, which is often used to refer to organized crime families or the Mafia.

that the confidential sources had proven reliable in the past and that their information was corroborated by independently obtained information. We conclude that the affidavit provided a substantial basis for the issuing magistrate to conclude that evidence of a crime would be obtained through electronic surveillance of the Webbes' offices at the Mayfair Hotel. *Gates*, 462 U.S. at 236, 103 S.Ct. at 2331.

Defendants' final challenge to the introduction of the evidence obtained through the electronic surveillance of the Mayfair Hotel offices is the government's conduct in obtaining access to those offices. Prior to applying for and obtaining a warrant authorizing electronic surveillance, a paid government informant, at the behest of the FBI, surreptitiously made wax impressions of the office keys on four separate occasions. The government later used keys made from these impressions to enter the offices after the district court's order authorizing electronic surveillance.

█ Defendants Gandy and Townsley have no proprietary interest in the offices at the Mayfair Hotel. Accordingly, neither of these defendants could assert a legitimate expectation of privacy in the offices secured by the keys and therefore lack standing to challenge the government's action in obtaining the duplicate keys. *United States v. Williams*, 737 F.2d 594, 616 (7th Cir.1984), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985).

█ Although Webbe, Jr. did have a legitimate expectation of privacy,[9] we conclude that his challenge must fail. When none of the evidence obtained in an initial illegal entry or seizure is used to obtain the warrant authorizing the subsequent entry or seizure, the valid warrant purges the evidence of any taint arising from the prior illegal activity. *Segura v. United States*, 468 U.S. 796, 814, 104 S.Ct. 3380, 3390, 82 L.Ed.2d 599 (1984). That is the situation

here. The government used the keys made from the unlawfully obtained wax impressions for entry into the offices only after the warrant authorizing surreptitious entry was issued. Further, "evidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence." *Id.* at 815, 104 S.Ct. at 3391. In order to install the authorized listening devices it was necessary to pick the lock on Webbe, Sr.'s office door. Thus, the government could have obtained entry without the assistance of the duplicate keys. Therefore, the government's prior illegal seizure was not a "but for" cause. In so ruling we in no way condone the government's conduct; we merely hold that that conduct does not require the suppression of the evidence.

### III. SUFFICIENCY OF COUNT I OF THE INDICTMENT

Count I of the indictment charges Webbe and Townsley with conspiracy to commit vote fraud in violation of 18 U.S.C. § 241. Defendants contend that the district court erred in failing to dismiss this count "because it was fatally defective in failing to charge that the object of the conspiracy was to destroy ballots cast for federal candidates or that the defendants had the specific intent to impede or influence the balloting for federal candidates." This argument can be summarily dispatched by comparing the present indictment with language the Supreme Court has found adequate in another § 241 prosecution:

[O]n May 12, 1970, a primary election was held in Logan County, West Virginia, for the purpose of nominating candidates for the offices of United States Senator, Representative to Congress and various state and county public offices.... [T]he defendants ... conspire[d] to injure and oppress the qualified voters of Mount Gray precinct in the

---

**9.** The government contends that in order to have standing the defendants must have a legitimate expectation of privacy in the secretary's desk and purse where the keys were at the time the informant obtained them to make the impressions. We disagree. The expectation of privacy is in the keys themselves. The Webbes

took steps to prevent the general circulation of the keys by entrusting them to their secretary and not authorizing her to give them to others. The fact that the keys were copied while in the possession of an employee rather than taken from Webbe's pocket does not alter his expectation of privacy in the keys.

free exercise and enjoyment of their "right to vote for candidates for the aforesaid offices and to have such vote cast, counted, recorded and certified at their full value and given full effect...." [I]t was a part of the conspiracy "to cause fraudulent and fictitious votes to be cast in said precinct...." *Anderson v. United States*, 417 U.S. 211, 227 n. 13, 94 S.Ct. 2253, 2264 n. 13, 41 L.Ed.2d 20 (1974).

The indictment in this case read:

On ... August 5, 1980, a Primary Election was held in the State of Missouri and the City of St. Louis for the purpose ... of selecting ... candidates ... for the offices of United States Senator, United States House of Representatives [and various state and local public offices].

[D]efendants ... conspire[d] ... to intimidate and oppress citizens of ... the 7th Ward of the City of St. Louis, to have ballots cast in elections where federal candidates are voted upon counted in a fair and impartial manner free from tampering and illegal destruction.

The object of this conspiracy was to destroy absentee ballots ... and thereby to prevent the tabulation of said ballots in that election.

■ The defendants here emphasize that the objective of the conspiracy was to influence the local rather than the federal election. This does not defeat the specific intent necessary to establish a conspiracy under § 241. Regardless of what our view might have been were we writing on a clean slate, it is now clear that "[t]he specific intent required under § 241 is not the intent to change the outcome of a federal election, but rather the intent to have false votes cast...." *Id.* at 226, 94 S.Ct. at 2263. In *Anderson* the vote fraud scheme

involved using the voting machine to cast an entire slate of votes, including votes for federal candidates, for all offices on the ballot. The Supreme Court concluded that the jury could believe that this reflected "the conspirators' underlying assumption that false votes would have to be cast for entire slates of candidates in order to have their fraud go undetected." *Id.* at 225, 94 S.Ct. at 2263. If the *Anderson* conspirators had cast votes only for the local election they intended to influence, the absence of votes for other candidates on the ballot could raise suspicion. Likewise, in the present case, the jury could infer that in instances destruction of the entire absentee ballot was necessary to avert suspicion that may have been caused by double-punching alone. Accordingly, the district court did not err in refusing to dismiss Count I, because at least one of the purposes of the conspiracy was the destruction of absentee ballots which included votes for federal offices.[10]

## IV. ALLEGED ERRORS IN THE INDICTMENT

Count I of the indictment charges a conspiracy to destroy absentee ballots in an election where federal candidates are included on the ballot. 18 U.S.C. § 241. Count III charges use of the mails to commit vote fraud. 18 U.S.C. § 1341. Appellants Townsley and Webbe were charged and convicted on both counts; appellant Gandy was convicted on Count III (Gandy was not charged in Count I of the indictment).

■ The government concedes on appeal that the appellants' convictions on Count III must be vacated in light of *McNally v. United States*, — U.S. —, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). In *McNally*

---

**10.** Because of our conclusion that Count I is sufficient under *Anderson,* we do not reach the question left undecided by the Supreme Court— whether 18 U.S.C. § 241 extends to conspiracies to cast votes in purely local elections in which no federal candidate is on the ballot. *Anderson,* 417 U.S. at 227–28, 94 S.Ct. at 2263–64; *see United States v. Olinger,* 759 F.2d 1293, 1301–05 (7th Cir.) (violation of § 241 may be found in a purely local election where state action is in-

volved), *cert. denied,* 474 U.S. 839, 106 S.Ct. 120, 88 L.Ed.2d 98 (1985); *United States v. Anderson,* 481 F.2d 685, 698–701 (4th Cir.1973) (same), *aff'd on other grounds,* 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974). State action may be present in this case through the defendants' use of notaries public who are appointed and commissioned public officers. Mo.Rev.Stat. § 486.205.

the Supreme Court limited the scope of 18 U.S.C. § 1341 "to the protection of property rights." *Id.* at 2881. The citizens' intangible right to good government is not encompassed by § 1341. The parties disagree, however, on the effect of vacating the convictions on Count III.

The government suggests that the only relief to which appellants are entitled is vacating the sentences imposed on Count III. Appellants argue that they are also entitled to a new trial on the remaining counts because the spillover effect from the government's proof on Count III prejudicially affected their trial on the other counts.[11] We cannot agree.

In their initial (pre-*McNally*) appellate brief, defendants argued that their convictions on both Counts I and III could not stand because both counts charged the same conspiracy. Both conspiracies are alleged to have occurred during the same time period and in the same geographic area. There is substantial overlap in the participants in both conspiracies. Finally, the overarching goal—influencing the absentee ballot count in the primary election—was the same. Despite the similarity, each count alleged a violation of a separate criminal statute. " 'The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.' " *Albernaz v. United States*, 450 U.S. 333, 337, 101 S.Ct. 1137, 1141, 67 L.Ed.2d 275 (1981) (quoting *Block-burger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932)).

Each count required an element of proof not required by the other. The separate element required in Count III was the use of the mails whereas Count I required that the government prove a conspiracy to prevent votes cast in a federal election from being counted. In all other respects the same evidence was admissible on both counts.[12] Therefore, the only spillover effect from Count III was evidence involving the use of the mails. This now extraneous evidence in no way prejudiced the defendants' trial on Count I and a new trial is not necessitated by the vacating of the convictions for Count III.

The convictions and sentences of defendants Gandy, Townsley and Webbe on Count III are vacated. Although not absolutely required, we believe that at times it is the better practice in a multi-count conviction to vacate defendants' sentences on the remaining counts and remand for resentencing when the conviction on one or more of the counts is vacated. *United States v. Shively*, 715 F.2d 260, 269 (7th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984); *see United States v. Diaz*, 778 F.2d 86, 88–89 (2d Cir.1985); *Cabbell v. United States*, 636 F.2d 246, 249 (8th Cir.1980). So here, in present circumstances, we vacate the sentences on defendants' remaining convictions and remand for resentencing.

■■■ Defendants next argue that the conspiracies charged in Counts III and IV

---

**11.** Following briefing in this appeal, the government moved to vacate the convictions on Count III of the indictment. In response, appellants requested this court to postpone oral argument or to allow further briefing and argument on the spillover issue at a later date. While additional briefing may have been helpful, the appellants have already had ample opportunity to do so. *McNally* was decided on June 24, 1987. Appellants' reply brief was not filed until September 18, 1987 and it included argument based on *McNally* (the government cited *McNally* in its brief filed August 5, 1987). Because this case already has a lengthy history (the indictment was returned on December 15, 1983) and the parties have had an opportunity to brief those issues on which supplemental briefing is requested, we decline to order additional briefing on an issue (spillover effect) of no particular legal complexity.

**12.** Although the Shrewsbury beating was alleged as an overt act in Count III, it also could have been admitted as evidence in Count I as an unalleged overt act. *See United States v. Lewis*, 759 F.2d 1316, 1344 (8th Cir.) (the government is not limited to overt acts specified in the indictment), *cert. denied*, 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985); *United States v. Elliot*, 571 F.2d 880, 911 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). Thus, the proof of the Shrewsbury beating did not result in any prejudicial spillover.

of the indictment actually consist of several separate conspiracies. As to Count III this argument is now moot. With regard to Count IV, defendants failed to object to the instructions given to the jury and thus did not preserve this issue for appeal. Fed.R. Crim.P. 30; *United States v. Hinderman,* 528 F.2d 100, 102 (8th Cir.1976). When a single conspiracy is alleged in the indictment but "the proof at trial reveals the existence of more than one conspiracy, 'the adequacy of the trial judge's instructions is of critical importance....'" *United States v. Jackson,* 696 F.2d 578, 584 (8th Cir.1982), *cert. denied,* 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983) (quoting *United States v. Johnson,* 515 F.2d 730, 735 (7th Cir.1975)). In such a situation the defendant is not entitled to an acquittal; rather the district court should give a multiple conspiracy instruction and a cautionary instruction that evidence relating to other conspiracies may not be used against him. *Id.* at 585. Defendants' lack of objection to the conspiracy instruction given by the district court forecloses any review by this court except for plain error. *See United States v. Debango,* 780 F.2d 81, 84 (D.C.Cir.1986) (defendant who did not object to district court's failure to give a multiple conspiracy instruction must demonstrate plain error on appeal to obtain relief). We conclude that the failure to give the multiple conspiracy instruction did not rise to the level of plain error because the evidence amply supported the existence of a single conspiracy to obstruct the grand jury investigation.[13]

## V. PEREMPTORY CHALLENGES

After the venire panel was reduced to forty-seven persons through strikes for cause, the government was permitted twelve peremptory challenges and the defendants twenty to arrive at the final petit jury of twelve with three alternates. Twelve black persons were among the forty-seven member venire panel. The government exercised its peremptory challenges first, using ten of its twelve challenges to remove black veniremen. The defendants struck one black venireman. The final black person served as an alternate juror and was excused prior to deliberations. Only defendant Gandy is black. However, all the defendants moved to strike the jury panel on the ground that the government unconstitutionally excluded black jurors in violation of the fifth and sixth amendments.

At the time of trial, *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), was pending in the Supreme Court. The government only generally stated "that there were factors affecting ... [its] exercise of the peremptory strikes *going well beyond any consideration of race.*" The district court denied defendants' motion to strike the jury panel and denied defendants' subsequent request that the court order the government to state on the record its reasons for the peremptory challenges to black venire persons. In light of the intervening decision in *Batson,* which is applicable to this case, *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987), we remand this case for further proceedings.

■ *Batson* involved a black defendant tried in state court who challenged the prosecution's use of peremptory strikes to exclude blacks from the petit jury, which ultimately convicted him. *Batson,* 106 S.Ct. at 1714. The Court granted Batson relief under the equal protection clause of the fourteenth amendment. *Id.* at 1718.[14]

13. Defendant Webbe also challenges the sufficiency of the allegations contained in Count IV of the indictment. We have reviewed the indictment and find this claim to be wholly without merit.

14. Although defendants generally objected to the composition of the petit jury under both the fifth and sixth amendments, the only argument they make on appeal is premised on the *Batson* decision. Although *Batson* was decided based on the equal protection clause of the fourteenth amendment, which applies only to the states, "[t]he fourteenth amendment recognizes no limits on state authority which the Bill of Rights and other constitutional provisions do not place on Congress." L. Tribe, *American Constitutional Law* 272 (1978). Because defendants' convictions were in federal court, their challenge cannot be founded on the fourteenth amendment which applies only to the states, but is based on the due process clause of the fifth amendment,

This was a clear break from prior Supreme Court precedent that proof of discrimination against blacks in jury selection must extend beyond the facts of the defendant's own case. *Swain v. Alabama*, 380 U.S. 202, 224–28, 85 S.Ct. 824, 838–40, 13 L.Ed. 2d 759 (1965), *overruled, Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. 2d 69 (1986). *Swain* required the defendant to show a *systematic* exclusion of blacks. *Id.* 380 U.S. at 223, 85 S.Ct. at 837; *United States v. Boykin*, 679 F.2d 1240, 1245 (8th Cir.1982). This had resulted in "prosecutors' peremptory challenges [being] largely immune from constitutional scrutiny." *Batson*, 106 S.Ct. at 1720–21.

To establish a prima facie case under the new rule announced in *Batson*,

> the defendant must first show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

*Batson*, 106 S.Ct. at 1723 (citations omitted). Although it appears from the record that defendant Gandy has made a strong showing for a prima facie case, we are impelled to remand to the district court to make that determination in the first instance. *See Batson*, 106 S.Ct. at 1725; *United States v. Wilson*, 816 F.2d 421, 423 (8th Cir.1987). If the district court determines that Gandy has indeed made out a prima facie case, "the burden shifts to the [government] to come forward with a neu-

tral explanation for challenging black jurors." *Batson*, 106 S.Ct. at 1723.[15]

 The challenge of defendants Townsley and Webbe to the composition of the petit jury is more problematic as they are both members of the white race. *See Batson*, 106 S.Ct. at 1723 ("To establish [a prima facie] case, the defendant must first show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race."); *United States v. Vaccaro*, 816 F.2d 443, 457 (9th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 262, 98 L.Ed.2d 220 (1987) (white defendant lacks standing to raise *Batson's* equal protection prohibition to striking of black jurors); *United States v. Sgro*, 816 F.2d 30, 33 (1st Cir.1987). However, should Gandy make the necessary showing of discriminatory use of peremptory challenges under *Batson*, it necessarily follows that Webbe and Townsley were treated differently because they were tried together with a black defendant. Such a result is repugnant to the Constitution. *See Palmore v. Sidoti*, 466 U.S. 429, 430–34, 104 S.Ct. 1879, 1880–83, 80 L.Ed.2d 421 (1984) (where the white mother of a minor child was deprived of custody because she chose to live with a black man); *see also United States v. Brown*, 817 F.2d 674, 675–76 (10th Cir.1987) (the court held that the prosecutor improperly exercised his peremptory challenges to strike black jurors because defendant's attorney was a prominent black political figure. No mention of defendant's race was made in the opinion although a prior opinion indicated he was black. *United States v. Brown*, 770 F.2d 912, 913 (10th Cir.1985), *rev'd sub nom. Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)). Furthermore, had this case been tried following *Batson*, any relief granted to Gandy also would have applied to his codefendants. We conclude, therefore, that Webbe and Townsley have standing to join in Gan-

---

which has equal protection attributes. *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). The holding in *Batson* is therefore applicable in federal criminal proceedings.

**15.** The government contends that Gandy waived any challenge he had to the jury composition by failing to request a severance. We find such an argument to be wholly without merit.

dy's *Batson* challenge,[16] and remand the case to the district court for further proceedings.

## VI. EVIDENTIARY OBJECTIONS

*A. Coconspirator Statements.* Appellants Webbe, Jr., and Townsley object to the unrestricted admission against them of various statements made in 1983 during the alleged cover-up of the earlier (1980) vote fraud. They refer to tape recordings of statements made by various defendants and alleged coconspirators. There were, for example, statements by Webbe, Sr., during sessions with various witnesses that, as we have already observed, *supra,* p. 1076, "can only be characterized as coaching them to present a united, fabricated front" in their testimony before the grand jury. Appellants argue that the indictment charged two distinct conspiracies, one in Count I to defraud voters of their right to have their votes counted in a federal election, and the other in Count IV to obstruct justice by fraudulently impeding the investigation of the alleged vote fraud. Efforts to conceal a criminal conspiracy are normally distinct from the conspiracy itself, they argue, and not automatically to be treated as a part or extension of that conspiracy. Statements made in 1983 in an effort to conceal the 1980 vote-fraud conspiracy are therefore not properly described as having been made "during the course ... of [that earlier] conspiracy," and are therefore not within the coconspirator exception to the hearsay rule, now codified in Fed.R.Evid. 801(d)(2)(E). Cases such as *Krulewitch v. United States,* 336 U.S. 440, 444, 69 S.Ct. 716, 718, 93 L.Ed. 790 (1949), are cited in support of this argument.

 In general, the theory behind this argument is well founded. See *Dutton v. Evans,* 400 U.S. 74, 81, 91 S.Ct. 210, 215, 27 L.Ed.2d 213 (1970); *Grunewald v. United States,* 353 U.S. 391, 401–02, 77 S.Ct. 963, 972, 1 L.Ed.2d 931 (1957). We nevertheless believe that the evidence in question was properly admitted in this particular case. For one thing, many, if not most, of the taped statements of which appellants are complaining were made in the presence of Webbe, Jr., or Townsley, or both. They would therefore be admissible as adoptive admissions under Rule 801(d)(2)(B), entirely apart from the particular requirements of 801(d)(2)(E). More fundamentally, the statements are admissible because they were made during the course of a conspiracy whose very existence justifies an inference that appellants had something they wanted to cover up, that something being the vote-fraud conspiracy charged in Count I.

It is important to remember that both Webbe, Jr., and Townsley were charged in both Count I and Count IV. Assume, further, that the two conspiracies were separate and distinct. A 1983 statement of Webbe, Sr., not made in the presence of, say, Webbe, Jr., would nevertheless be admissible against him as being made during the course and in furtherance of the 1983 conspiracy to obstruct justice. There was ample evidence to establish this conspiracy, especially under the somewhat relaxed standards now in force under *Bourjaily v. United States,* —— U.S. ——, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), holding that coconspirators' statements themselves may be considered by the court when it makes its preliminary findings of fact for purposes of its evidentiary ruling under Rule 801(d)(2)(E). The Webbe, Sr., statements therefore properly come in against Webbe,

---

**16.** Defendants' argument on appeal is restricted to the equal protection holding of *Batson.* We express no opinion on any due process or statutory argument they may have. *See Peters v. Kiff,* 407 U.S. 493, 501–05, 505–08, 92 S.Ct. 2163, 2168–70, 2170–71, 33 L.Ed.2d 83 (1972) (plurality opinion). We also have no occasion to address the defendants' sixth amendment right to an impartial jury. *Batson,* 106 S.Ct. at 1716 n. 4; *see United States v. Childress,* 715 F.2d 1313, 1320 (8th Cir.1983) (en banc) (any sixth amend-

ment challenge to the prosecutor's use of his peremptory challenges "must squarely confront *Swain* "), *cert. denied,* 464 U.S. 1063, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984). The analysis in *Childress* relied heavily on *Swain,* and the *Batson* decision draws into question its result. *See also* Massaro, *Peremptories or Peers?—Rethinking Sixth Amendment Doctrine, Images and Procedures,* 64 N.C.L.Rev. 501 (1986) (arguing the sixth amendment is the proper source of challenges to jury composition).

Jr., and Townsley as to the obstruction-of-justice conspiracy. From a finding of such a conspiracy it is permissible to infer, in turn, that something existed that Webbe, Sr., Webbe, Jr., and Townsley thought needed to be covered up. The statements of Webbe, Sr., complained of thus need not come in directly as evidence of the 1980 vote-fraud conspiracy. They are properly admissible to show the 1983 conspiracy to conceal the 1980 vote-fraud conspiracy, and the very existence of such a 1983 conspiracy tends to show that there was such a 1980 conspiracy. If either Webbe, Jr., or Townsley were not parties to either the 1983 or the 1980 conspiracy, there would be serious problems with this line of reasoning, but that is not the case. Both of the appellants and the declarant (Webbe, Sr.) were alleged to be parties to both the conspiracies charged, and there was sufficient evidence to show it. It is not necessary to decide what the law would be if the appellants, or one of them, had not been involved in the cover-up.

For these reasons, we reject appellants' objections to the conspirator statements.

*B. Evidence of Other Bad Acts.* Over defendants' objections, the district court admitted recorded conversations in which Webbe spoke of doing physical harm to Brandhorst and of keeping campaign workers out of the Seventh Ward. The evidence was admitted pursuant to Fed.R.Evid. 404(b) which provides that evidence of other wrongs is admissible "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The evidence was directed at Count III and in particular to the Shrewsbury beating which is alleged as an overt act in that count.

In determining the admissibility of evidence under Rule 404(b), we have articulated five requirements for consideration. *United States v. Gustafson,* 728 F.2d 1078, 1082–83 (8th Cir.), *cert. denied,* 469

U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984). First, a material issue on which other crimes evidence is admissible must be raised. *Id.* at 1083. Appellants' general denial of the charges against them raises issues of intent, motive and plan, which this evidence bears upon. *United States v. Engleman,* 648 F.2d 473, 478–79 (8th Cir. 1981). Second, the Rule 404(b) evidence must be relevant. This evidence was relevant because it demonstrated appellants' desire for continued control of the Seventh Ward, through force if necessary, thus demonstrating their complicity in the Shrewsbury beating. Third, the evidence of the other crimes must be clear and convincing. Appellants do not challenge the authenticity of the recorded conversation. Fourth, in order to be admissible to prove intent, knowledge or plan, the Rule 404(b) evidence must be similar in kind and reasonably close in time to that charged at trial. The threatened use of force is identical to that used against Shrewsbury to maintain control of the Seventh Ward. The recorded conversations took place after the Shrewsbury beating and appellants contend that *subsequent* crimes should not be admitted. We have previously found such an argument to be without merit. *United States v. Rilely,* 657 F.2d 1377, 1388 (8th Cir.1981). Finally, the evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice...." Fed.R.Evid. 403. We conclude that the balance here weighs heavily in favor of admitting the evidence.

In determining whether to admit evidence of other crimes, the district court has broad discretion. *Gustafson,* 728 F.2d at 1083. We will reverse that decision only "when it is clear that the questioned evidence has no bearing upon any of the issues involved at trial." *Id.* Appellants have not met this high standard and we find no error in the district court's decision to admit the Rule 404(b) evidence.[17]

---

17. While our discussion of the relevant factors focused on Government's Exhibit 1, we also conclude that Government's Exhibits 2 and 4 (whose admission appellants also challenge) were admissible for the same reasons outlined above. Exhibits 2 and 4 were recorded conversations between Webbe and Gandy regarding threats made to a political leader to stay out of a housing project in the Seventh Ward. This was the same housing project where Shrewsbury was beaten.

■ *C. Attorney–Client Privilege.* Appellants next contend that the conversations intercepted at the Mayfair Hotel which involved Webbe, Sr. were inadmissible because Webbe, Sr. was an attorney and their admission violated the attorney-client privilege. "A communication is not privileged simply because one of the parties to it is a lawyer." *Diversified Industries, Inc. v. Meredith,* 572 F.2d 596, 612 (8th Cir.1978) (Henley, J., concurring and dissenting). A conversation will not be cloaked with privilege when it is for the purpose of committing a crime. *Id.; United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass. 1950). It is abundantly clear from our review of the conversations played for the jury that Webbe, Sr. was vigorously participating in the obstruction of the grand jury's investigation. The conversations show that Webbe, Sr. was interested in presenting a uniform, knowingly untruthful, story from the various witnesses and actively coached them to that end. We emphatically reject any attempt to shield these conversations as privileged communications. *See United States v. Gordon–Nikkar,* 518 F.2d 972, 975 (5th Cir.1975) (plans to commit perjury and hide criminal activity are beyond the scope of the privilege).

■ *D. Sufficiency of the Evidence.* We have no doubt that the evidence was sufficient to sustain the jury's verdict and we will not recount that evidence here. Webbe argues, however, that his acquittal on Count VII (obstruction of justice) and his conviction on Count IV (conspiracy to obstruct justice) are inconsistent and undermine the sufficiency of the evidence. We have previously found such an argument frivolous. *United States v. Shigemura,* 682 F.2d 699, 705 n. 11 (8th Cir.1982), *cert. denied,* 459 U.S. 1111, 103 S.Ct. 741, 74 L.Ed.2d 962 (1983).

■ Finally, we reject appellants' argument that the evidence was insufficient to show the agreement necessary for a conspiracy. "[C]ircumstantial evidence will suffice as proof of an individual's involvement in a conspiracy." *United States v.*

*Burchinal,* 657 F.2d 985, 992 (8th Cir.), *cert. denied,* 454 U.S. 1086, 102 S.Ct. 646, 70 L.Ed.2d 622 (1981). We believe that the evidence is more than sufficient for the jury to conclude that Townsley, Webbe and Gandy conspired both to commit vote fraud in the 1980 election and subsequently to present a contrived story to the grand jury in 1983.

## VII. CONCLUSION

The convictions of defendants Townsley, Webbe and Gandy on Count III of the indictment are reversed. The case is remanded and the district court is directed to conduct a hearing, as required by *Batson,* into the government's use of its peremptory challenges. Should the district court find no *Batson* violation upon remand, defendants Townsley and Webbe's convictions on Counts I and IV are affirmed, but the sentences are vacated for resentencing. We do not retain jurisdiction upon remand and any subsequent appeal may be had as provided by law.

HENLEY, Senior Circuit Judge, dissenting.

Appellants allege that the district court erred in admitting, over their objections, taped conversations from the 1983 electronic surveillance of the Mayfair Hotel to prove appellants' participation in the 1980 vote fraud conspiracy. The district court relied on the coconspirator hearsay exception in admitting the tapes. That provision reads, "A statement is not hearsay if ... [it] is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). Because of the lengthy lapse between the 1980 vote fraud activity and the statements intercepted in 1983, defendants present a genuine issue whether the 1983 statements were made "during the course" of the 1980 conspiracy they were offered to prove. I dissent from that portion of part VI. A. of the majority opinion finding these statements admissible against appellant Townsley.

The government correctly asserts that the 1983 statements would be admissible against the individual declarant to prove his or her guilt in the 1980 conspiracy. Fed.R.Evid. 801(d)(2)(A). Because Webbe either participated in or was present during all the 1983 conversations, I agree that those recorded conversations were properly admissible against him under Rule 801(d)(2)(A) & (B). Townsley, however, only minimally participated in the 1983 conversations and the vast majority of the conversations were not admissible against her under Rule 801(d)(2)(A) & (B). I also dissent from the majority's conclusion that those statements were admissible against Townsley as coconspirator statements. *See* Rule 801(d)(2)(E).

> It is settled that in federal conspiracy trials the hearsay exception that allows evidence of an out-of-court statement of one conspirator to be admitted against his fellow conspirators applies only if the statement was made in the course of and in furtherance of the conspiracy, and not during a subsequent period when the conspirators were engaged in nothing more than concealment of the criminal enterprise.

*Dutton v. Evans,* 400 U.S. 74, 81, 91 S.Ct. 210, 215, 27 L.Ed.2d 213 (1970); *Krulewitch v. United States,* 336 U.S. 440, 444, 69 S.Ct. 716, 718, 93 L.Ed. 790 (1949).

A subsidiary conspiracy to conceal the central criminal purpose of the initial conspiracy will not be implied. *Grunewald v. United States,* 353 U.S. 391, 401–02, 77 S.Ct. 963, 972, 1 L.Ed.2d 931 (1957). A caveat to the refusal to extend Rule 801(d)(2)(E) to subsequent concealment efforts is necessary.

> By no means does this mean that acts of concealment can never have significance in furthering a criminal conspiracy. But a vital distinction must be made between acts of concealment done in fur-

therance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime.

*Id.* at 405, 77 S.Ct. at 974. Thus, the repainting of a stolen car, *id.,* the selling of the stolen property, or other similar act, E. Cleary, ed., *McCormick on Evidence* § 267 at 793 (3d ed. 1984), are admissible in evidence because they are in furtherance of the main objective of the conspiracy. Accordingly, the government's reliance on this court's decision in *United States v. Lewis,* 759 F.2d 1316 (8th Cir.), *cert. denied,* 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed. 2d 357 (1985), is misplaced. In *Lewis* the acts of concealment occurred while the drug distributing conspiracy was still ongoing, thus furthering the continuing criminal objective of the conspiracy. *Id.* at 1342–43; *see United States v. Pecora,* 798 F.2d 614, 630–31 (3d Cir.1986) (concealment allowed the continuation of an illegal payoff scheme), *cert. denied,* —— U.S. ——, 107 S.Ct. 949, 93 L.Ed.2d 998 (1987). Here, the criminal objective of Count I, to influence the 1980 election, had been attained and statements made in the subsequent 1983 coverup are beyond the scope of Rule 801(d)(2)(E).[1]

The evidence admitted at trial that was obtained through the 1983 electronic surveillance was voluminous, comprising several hundred pages of transcript. The evidence included numerous inculpatory statements and was not merely duplicative of the direct evidence supporting the convictions on Count I. Therefore, I am unable to conclude that the admission of this evidence in violation of Rule 801(d)(2)(E) was harmless beyond a reasonable doubt. *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946); *United States v. Yow,* 465 F.2d 1328, 1331–32 (8th Cir.1972). I would re-

---

1. The government's argument, read expansively, contends that an overarching conspiracy existed which covered the entire time period of 1980 through 1983. This conspiracy encompassed the Seventh Ward Organization (headed by Webbe) and had as its objective maintaining political control of the Seventh Ward. I decline to allow the government to rely on such an overarching unalleged conspiracy as a conduit through which statements made during the time period of one specific alleged conspiracy may flow becoming evidence in another conspiracy during a separate time period.

verse the conviction of Townsley on Count I and remand for a new trial.

BOWMAN, Circuit Judge, concurring in part and dissenting in part.

While concurring in the rest of the Court's decision, I respectfully dissent from Part V. of the opinion insofar as it applies to defendants Townsley and Webbe. While I agree that defendant Gandy, who is black, has made a strong showing for a prima facie case under the principles enunciated in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), I do not agree that Townsley and Webbe, who are white, are entitled to join in Gandy's *Batson* challenge. In order to invoke the constitutional protections announced in *Batson*, "the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723 (citation omitted). *Cf. United States v. Garcia*, 836 F.2d 385, 388 (8th Cir.1987). The very language of *Batson* thus makes it clear that Townsley and Webbe have no standing to complain about the exclusion of black jurors.

It cannot be argued seriously that Townsley and Webbe suffered any prejudice from the racial composition of the petit jury selected for their trial. Even assuming that the jury was unfair in a constitutional sense as to Gandy, in what sense was the composition of the jury unfair as to Townsley and Webbe? The two cases relied upon by the Court, *ante* at 1084, are of no help in answering that question. In both cases, the complaining party (unlike Townsley and Webbe) experienced direct, personal prejudice by reason of racially discriminatory governmental actions. Thus, in *Palmore v. Sidoti*, 466 U.S. 429, 433–34, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984), the Supreme Court reversed a custody award that deprived a white mother of the custody of her minor child solely because the mother was cohabiting with a black man. Similarly, in *United States v. Brown*, 770 F.2d 912, 913 (10th Cir.1985), *rev'd*, —— U.S. ——, 107 S.Ct. 708, 93 L.Ed.

2d 649 (1987), *on remand*, 817 F.2d 674 (10th Cir.1987), the prosecution denied the black defendant the benefit of a constitutionally selected jury by exercising its peremptory challenges on the basis of an assumed affinity between potential black jurors and defense counsel, a prominent black politician. The Court's decision in the present case, far from having any support in prior decisions, is in fact an unprecedented extension of *Batson*—an extension that, as demonstrated by the portion of *Batson* quoted in the preceding paragraph, is contrary to *Batson's* guiding principles.

Even if Gandy wins his *Batson* hearing and gets a new trial, the conclusion that the jury Townsley and Webbe had was a fair jury as to them will not change. Although a jury including more blacks would be different from the jury that tried Townsley and Webbe, that is beside the point. If the challenged jurors could not have been struck for cause (and there can be no *Batson* violation unless that is the fact), the exercise of peremptory challenges against blacks (or against any other potential jurors, for that matter) inevitably changes the composition of the jury. Under *Batson*, however, the difference in the composition of the jury resulting from the use of peremptory challenges matters only when members of a cognizable racial group are struck and only with respect to a defendant who is a member of that group. By what mysterious alchemy does a defendant who is not a member of a cognizable racial group, and who therefore would have no standing to invoke *Batson* if he or she were tried alone, suddenly come to be protected by *Batson* when tried with a co-defendant who is a member of a cognizable racial group? The Court's opinion does not give us a satisfactory answer to that question.

Because there is nothing in the *Batson* opinion even to suggest that a white defendant may assert its principles derivatively through a black co-defendant, and because the Court has no factual basis for concluding that a white defendant tried with a black co-defendant suffers any prejudice when blacks are excluded from their

petit jury, I cannot agree with the Court that Townsley and Webbe are entitled to benefit from Gandy's *Batson* challenge. *See United States v. Vaccaro*, 816 F.2d 443, 457 (9th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 262, 98 L.Ed.2d 220 (1987) ("[U]nder *Batson*, [the white defendants] could not have made out a prima facie case of discrimination in juror selection in any event."). *Cf. United States v. Sgro*, 816 F.2d 30, 33 (1st Cir.1987) ("For a defendant to establish a prima facie case of purposeful discrimination in the selection of the petit jury, ... the defendant first must show that he is a member of a cognizable racial group."), *cert. denied*, Feb. 22, 1988.

*Batson* was designed to protect blacks and other minority defendants from invidious discrimination in the jury selection process. It was not intended to be used, and should not be used, as a basis for overturning the convictions of defendants who are not members of the black race and who in no way suffered any prejudice from the prosecution's exercise of its peremptory challenges to remove black jurors. I therefore would affirm the convictions of Townsley and Webbe on Counts I and IV, vacate the sentences imposed thereon, and remand the case to the District Court for resentencing in view of our reversal of the convictions on Count III. I would remand the case for further proceedings under *Batson* as to Gandy alone.