684 F.Supp. 1491 (1988)
In the Matter of the SEARCH OF BUILDING T AND SECURED PARKING AREA NORTH OF EMERSON BLVD., etc.
No. 88-403C.
United States District Court, E.D. Missouri, E.D.
April 27, 1988.
*1492 James G. Martin, Asst. U.S. Atty., St. Louis, Mo., for plaintiff.
Veryl L. Riddle, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for defendant.

ORDER
LIMBAUGH, District Judge.
On February 24, 1988, a United States Magistrate issued a search warrant for certain areas of an Emerson Electric Company assembly facility in St. Louis County, Missouri. The warrant authorized seizure of certain assembled and partially assembled Artillery Target Locating Vehicles (ATLVs) which were being manufactured under a commercial contract with the government of Egypt. On February 25, 1988, federal agents, with the assistance of Missouri State Troopers, executed the search warrant at the Emerson facility. Substantial information and pictures were gained from the search and the vehicles *1493 and component parts that were seized have been returned to Emerson. There has been no indictment returned against Emerson or against any of its officials at this juncture.
This matter is before the Court, not as a criminal proceeding, but rather at the instance of Emerson, which has urged the Court to exercise its anomalous or general equitable jurisdiction[1] to quash the government's warrant and suppress the fruits of its search. Emerson has also attempted to engage in civil discovery to aid its attack on the search warrant which the government has resisted, arguing that such discovery would interfere with an ongoing criminal investigation.
Emerson has launched a three-pronged attack on the search alleging: (1) that the warrant is overly broad and does not describe the items to be seized with sufficient particularity; (2) that the warrant was improperly executed and that the actual search exceeded the permissible scope established by the warrant; and (3) that the affidavit upon which the warrant is based contains substantial and materially false information included as a means of manufacturing probable cause, in disregard of Emerson's Fourth Amendment rights. The Court notes initially that the exercise of its anomalous jurisdiction is extraordinary and is to be exercised with caution and restraint, In Re Harper, 835 F.2d 1273, 1274 (8th Cir.1988), and it does not believe that Emerson's arguments as to the scope of the warrant or its execution are compelling enough to mandate the exercise of this jurisdiction.[2] As to the warrant affidavit, however, it appears that Emerson has raised substantial questions as to certain representations set forth in that document and that a closer analysis is called for.
The warrant affidavit was sworn out by one John E. Lake, a special agent with the Office of the Inspector General for the United States Department of Defense, who averred that he has been involved in the investigation of procurement/contract fraud committed against the Department of Defense, including fraudulent billing claims and false statements and certifications made to that department. Lake claimed that he had been investigating Emerson since October of 1987 and that it was his belief that certain transfers of U.S. Government owned monies, components and equipment to the contractor's commercial inventory had resulted in fraudulent billings to the government by the company. Lake recited that on January 5, 1988 a government employee reported that he had observed a U.S. Government contract component part installed in an Egyptian ATLV. According to the affidavit, when the matter was brought to the attention of Emerson's management, they advised that no government materials were being transferred for use on the ATLV contract and that if such a transfer had in fact occurred, it was the result of error.
On February 2, 1988, the same government employee was said to have observed another U.S. Government component installed in the subassembly of an Egyptian ATLV. On February 18, government components were identified on three ATLV vehicles and one ATLV subassembly, all destined for delivery under the Egyptian contract. In all cases except one, a United States Government contract number was marked on the subject components. The exception to this pattern was that on one of the components the government contract number had been "defaced beyond recognition."
*1494 With this factual background, Agent Lake then went on to relate conversations he had held with three government employees, all of whom were said to have had substantial experience and expertise in the areas of defense contracts and related federal regulations. The first was identified as an industrial specialist of the Defense Contract Administration Services Management Area, the same unnamed individual who reportedly observed firsthand the government components installed in the foreign contract vehicles. This industrial specialist believed, according to the affidavit, that these parts transfers represented a clear violation of the Defense Production Act and its regulatory offspring, the Defense Priorities Allocations System (DPAS). The affidavit explained that under DPAS, contractors such as Emerson are required to assure the timely availability of industrial resources when required by current national defense needs. The affidavit cites a number of federal regulations falling under 15 C.F.R. § 350, all provisions of the Defense Priorities and Allocations System, for the proposition that "under no circumstances is it lawful to transfer United States Government Defense components to direct foreign sales contracts."
The second individual relied upon in the affidavit was an unnamed official identified as the "DOD Arm[ed] Services Production Planning Officer (ASPPO), St. Louis, DCASMA." The affidavit described this person as the senior technical expert on the Defense Production Act regulations and stated that he had fully concurred with the findings and interpretation of the industrial specialist regarding the serious violations allegedly committed by Emerson.
The third individual cited by the affidavit was named John Richards, the director of the Office of Industrial Resource Administration of the U.S. Commerce Department in Washington. Richards was credited as stating that no adjustments or exceptions exist for Emerson that would allow them to transfer components from a government contract to any commercial or foreign sales contract. Richards was also said to have stated that any ATLV being built for a foreign government by Emerson should not have any parts on them covered under the Defense Production Act. The existence of such transfers, according to Richards, demonstrated a violation of Title I of the Defense Production Act of 1950.
The magistrate reviewing the search warrant affidavit determined that there was probable cause to believe that the search, as outlined, would yield evidence of a crime. Accordingly, the warrant was issued and the search was conducted as set forth above. Emerson argues, however, in its motion to quash, that the same magistrate would not have found probable cause were the warrant affidavit reformed to exclude various false statements and to add certain material omissions. It is clear that there are certain inaccuracies in the warrant affidavit and under the controlling law of this circuit, if Emerson can demonstrate: (1) a clear showing of a search and seizure in callous disregard of the Fourth Amendment; (2) irreparable injury if relief is not granted; and (3) the absence of an adequate remedy at law, then this Court could exercise its anomalous jurisdiction to quash the warrant. Pieper v. United States, 604 F.2d 1131, 1133 (8th Cir.1979).[3]
*1495 The Court believes that Emerson has satisfied the second and third elements of the Pieper test, namely that it would be irreparably harmed if the government uses this evidence to obtain an indictment and that it is without an adequate remedy at law to later obtain relief. Emerson points to federal regulations which provide for suspension of contractors from bidding on government contracts upon "adequate evidence" of a variety of offenses. Indictment for fraud or for a criminal offense in connection with fraud in the performance of a public contract constitutes "adequate evidence" for suspension. 48 C.F.R. § 9.407. The Court feels strongly that this type of suspension would clearly constitute irreparable harm to a company in Emerson's line of business. In addition, as the Eighth Circuit recognized in Pieper, irreparable harm is the normal result when a person or company is faced with a "stigmatic criminal indictment." Id. at 1134.
Regarding the question of whether Emerson has an adequate remedy at law, the Court of Appeals in Pieper opined that:
[W]hile in most situations, the remedy of a post-indictment motion to suppress under Rule 41(f) of the Federal Rules of Criminal Procedure is adequate, it is felt that a person should not suffer the indelible stigma of a criminal indictment if that indictment is based solely on evidence obtained through gross government misconduct.
Id. (emphasis added). This Court takes this passage to mean that in most instances, but not all, a motion to suppress is an adequate legal remedy. One instance where it will not be adequate is where an indictment is grounded completely and exclusively on the evidence obtained through an improper search. The propriety of that search must be severe enough to demonstrate callous disregard by government officials of the movant's Fourth Amendment rights.
It is unclear, in this case, whether the government intends to press for an indictment of Emerson or its officials and if so, whether such indictment would be based on evidence obtained from the search or upon other evidence, or both. Nevertheless, the Court believes that this is an instance where a motion to suppress following an indictment would be an inadequate remedy. Emerson stands to incur not only damage to its business reputation, but also a possible suspension from bidding on government contracts that could mean a loss of millions of dollars in annual revenues and affect the jobs of hundreds of people. Given these circumstances, an inquiry into the first element of the Pieper analysis is warranted.[4]
As outlined previously, the warrant affidavit alleges that Emerson has submitted *1496 fraudulent billings for contracts performed for the Department of Defense. The most notable representations made in the affidavit in support of this allegation are that: (1) a number of government contract components were installed in foreign contract vehicles; (2) Emerson officials denied this or said that these parts transfers were a mistake; and (3) on one of the components the government contract number had been obliterated. The Court believes that these allegations alone would support a finding of probable cause. In making such a determination, the task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that ... evidence of a crime will be found in a particular place. See Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), United States v. Townsley, 843 F.2d 1070 (8th Cir.1988). Emerson argues that the warrant affidavit must describe a crime before probable cause can be found and it maintains that the "ad hoc" legal opinions of the agent Lake's cited experts are subject to impeachment.
Initially it appeared that statements attributed to these three government officials as to the illegality of Emerson's alleged parts transfers were the lynchpin upon which the company's motion to quash depended. This case involves many complex areas of government regulation as well as technical issues involving complicated defense machinery. It is tempting to infer that outside validation of the illegality of the alleged conduct is a necessary element of the warrant affidavit since often only persons with substantial familiarity with defense industry regulations will be able to determine whether the law has been broken. As Emerson argues, the mere fact of parts transfers between contracts might be malum prohibitum, but it is not, without more, malum in se.
The reason the validity of the warrant affidavit does not turn on these statements or opinions is that it describes more than one type of criminal or illegal activity. While the initial portions of the affidavit allege fraudulent billing practices, the opinions of the government officials describe a distinct violation of the law independent of fraud. The affidavit represents that each of these officials felt that Emerson had not complied with the Defense Priorities and Allocations System (DPAS) and that transfers of parts from a government contract to a foreign contract were per se DPAS violations. After analysing the proof submitted by Emerson and the regulations cited on the face of the affidavit, the Court believes that Emerson has demonstrated substantial misrepresentations with regard to this area of alleged wrongdoing. For one thing, the cited regulations do not stand for the proposition that parts transfers from government contracts to commercial contracts are a violation of the law. Rather, the regulations which constitute the DPAS scheme merely establish that certain high priority U.S. Government projects must be given precedence over other projects, including prior commercial contracts, in the interests of national security. While Emerson might certainly have violated DPAS if it favored its Egyptian ATLV contract at the expense of a higher priority government contract, there is no indication in the affidavit that this has occurred. While parts transfers from a government contract might often delay the ultimate completion of that contract, it does not necessarily follow that this will always be the case. If the government components are not required at a particular phase of assembly or if there are extra parts at a given point in time, it is conceivable that these parts could be used on other contracts and replaced before needed on the government project. If a proper accounting and inventory is not maintained relative to these transfers, then an inaccurate or even fraudulent billing may be the result, but this is quite another matter from the issue of whether DPAS has been violated. Nothing in the affidavit represents that a high priority government contract has been impeded or that the contract from which the parts were taken was even accorded the preferential status referred to in DPAS.
*1497 In addition, Emerson has produced an affidavit from John Richards, the only named individual among the three government officials referred to. This affidavit is evidence that the qualified statement he claims to have made to the agent at the time of their communication, became an unqualified statement when it was related in the affidavit. The warrant affidavit states in pertinent part:
[Richards] further stated that any ALTV being built for a foreign Government by Emerson Electric should not have any parts on them covered under the Defense Production Act provisions. The existence of such a transfer would constitute a violation of Title I of the Defense Production Act of 1950.
Mr. Richard's affidavit makes this statement:
When asked by Mr. Lake if the transfer of materials or components acquired under the DPAS for a United States Government contract to a commercial contract would be a violation of the DPAS, I advised that the DPAS did provide for the use of priority ratings to replace inventory, however, any other unauthorized use of the DPAS to support a commercial contract could most certainly constitute a violation.
(emphasis added). Emerson has been unable to contact the other referenced government officials because the government has refused to disclose their identity.
Despite these questionable representations as to Emerson's compliance with DPAS, there remains the allegation of fraudulent billing by Emerson for parts paid for by the government but installed in vehicles destined for sale to a foreign commercial customer.[5] As stated previously, the Court feels that the facts represented in the affidavit as to this allegation would support a finding of probable cause. Emerson, however, without (successfully) rebutting the existence of the parts transfers, the contract number obliteration, or their denial that the transfers were taking place, has raised a credible argument that is highly relevant to whether its Fourth Amendment rights have been violated. Emerson asserts that it had authority to make parts transfers between contracts by virtue of a government-approved "Material Accountability Plan." According to Emerson, for several years the company regularly transferred material from military to commercial contracts, and vice versa, without simultaneously transferring the costs allocated for the purchase of that material. The basis of this "borrow and payback" system was that random transfers of parts from United States to foreign contracts would be balanced over an extended period of time by transfers from foreign contracts for use on United States government projects.
In late 1986, the Administrative Contracting Officer assigned to Emerson, Tony Karpowicz, wrote to the company threatening to invoke the civil remedy of halting progress payments on Emerson's government contracts unless the borrow and payback system was discontinued. According to Emerson what followed was a series of negotiations aimed at developing a system whereby the company could make parts transfers between contracts while satisfying the government that proper accounting and inventory adjustments were being maintained. These negotiations ultimately resulted in the creation of a "Material Accountability Plan" which Karpowicz found to be "conditionally acceptable" by letter dated April 7, 1987. The plan basically places components or parts into two categories; high value parts and low value parts. High value parts are to be stored in a separate storeroom and if a change in ownership occurs (a transfer to another contract) then an accounting adjustment is made to reflect the transfer. Low value parts are allowed to be commingled. There is no distinction drawn by the agreement between foreign contracts or domestic commercial contracts. Emerson claims it has been implementing this Material Accountability Plan over a period of months and that *1498 it has recently spent hundreds of thousands of dollars installing computers to help administer the system. The government has not denied that the agreement was in operation at the time of the search but has responded somewhat rhetorically that Emerson has made no offer of proof that it was in compliance with the plan or that the agreement even contemplates transfers to foreign contracts. Emerson argues that if it was in compliance with the plan or was attempting to comply with the plan, then it cannot be chargeable with criminal conduct. Further, if the affiant on the warrant affidavit knew of the existence of such a plan when the warrant was sworn to the magistrate, then his failure to inform the magistrate of this fact was a material omission that, if considered in tandem with the remaining representations, defeats probable cause.
In United States v. Reivich, 793 F.2d 957 (8th Cir.1986)[6] the Eighth Circuit Court of Appeals held that a facially sufficient affidavit may be challenged on the basis of alleged deliberate material omissions. Id. at 960. Turning to the first consideration set forth in Pieper, it is plausible that omission of the existence of the material accountability plan could, in some circumstances, demonstrate "callous disregard" of Emerson's Fourth Amendment rights.[7] On April 19, 1988, while on assignment in the southeastern division of this district, the Court held a hearing at the Federal Courthouse in Cape Girardeau, Missouri to examine Agent Lake and to inquire as to his knowledge of the Emerson plan.[8] The Court propounded a number of questions to Agent Lake and later permitted both the government and Emerson's attorneys to cross-examine the witness within the scope of the Court's line of questioning. Lake testified that he was aware of the plan, but that he was told by Tony Karpowicz, the government's administrative contracting officer at the plant, that the plan never included transfers to foreign or commercial contracts other than U.S. government contracts. In any event Lake testified, in addition, that Karpowicz told him that the plan had been cancelled in early February.
If Lake's testimony was truthful, and his demeanor, general appearance and credibility would tend to suggest that it was, then it would appear that his failure to mention the existence of the plan in the warrant affidavit was not an intentionally misleading omission. Nevertheless, assuming that Agent Lake's representations were made in complete good faith, there are some inconsistencies remaining. For one thing, as stated, Lake recited that he was told that the plan had been cancelled by a February 3, 1988 letter from Karpowicz to an Emerson official. It is unclear whether Lake read the letter himself, but Emerson has produced a copy of a letter from Tony Karpowicz to Phillip M. Ford, a senior vice president of Emerson, dated February 3, 1988, which refers to the parts transfers to the Egyptian contract.[9] The letter does *1499 not purport to end the material accountability plan and it complains of the parts transfers, not because they were made to a foreign commercial contract, but rather because Emerson allegedly was not following the requirements of the plan. The letter states in pertinent part:
Dear Mr. Ford:
* * * * * *
Request Emerson review, what appears to be, noncompliance contractual practice(s) regarding part(s) being transferred from the FISTV Contract, DAAE07-86-C-A034, to the ATLV contract without either proper material transfer documentation and appropriate cost transfer information being provided the ACO in accordance with reference letter. [Emerson letter of February 18, 1987 which was the cover letter for the then-proposed material Accountability Plan]. Part number 62319/2059-3, Hydraulic Manifold, identified to the FISTV contract was found assembled in an ATLV targeting head without proper ACO notification documents to support the material/cost transfer.
Request you review existing practices and provide the undersigned an explanation for the cited example. If the Government has paid for such parts under the provisions of the FISTV progress payment clause, request a credit proposal, including interest, be prepared and submitted to the ACO. Pending correction and/or ACO notification, no material transfers, FISTV to ATLV, are authorized without ACO approval.
 Sincerely,
 Tony M. Karpowicz
 Administrative Contracting
 Officer
Although the letter does not put an end to the Material Accountability Plan, it clearly does place restrictions on Emerson's future ability to make parts transfers to the ATLV contract. By the terms of this letter, any subsequent transfer of parts from the government FISTV contract to the Egyptian ATLV contract without explicit approval from Karpowicz, would be an unauthorized transfer. As the warrant affidavit states, unrebutted by Emerson, there were transfers of government parts made to the ATLV contract subsequent to the Karpowicz letter.
In any event, the Court does not believe that Agent Lake's good faith would necessarily insulate the warrant from further attack. If other government officials lied to the agent in providing him with facts material to the warrant affidavit, then the fact of his good faith may not protect the warrant from challenge. The Supreme Court has held, for example, that while a police officer may rely on the statements of other officers in determining that an arrest should be made, at least someone in the chain of information among the police must have had the requisite probable cause for the arrest. Whiteley v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), see also, LaFave, Search and Seizure, § 3.5 (1987). Without such probable cause, the good faith of the arresting officer is of no import.
Having made this point, however, the Court does not believe that the inconsistencies between Agent Lake's testimony and the February 3, 1988 Karpowicz letter are of enough significance to warrant an examination of Mr. Karpowicz. Even if Karpowicz told the agent that the plan had been terminated or cancelled, it appears that it had, in fact, at least been suspended. Whether terminated or suspended, Emerson cannot argue that its parts transfers after February 3, 1988 were authorized under the plan unless it can demonstrate that Karpowicz either approved them, as contemplated by his letter, or that there was some other justification that would tend to show subsequent bad faith by the government in obtaining the search warrant.
In summary, while it appears that Emerson has shown that it would be irreparably harmed by an indictment based on the search and that there are no adequate post-indictment legal remedies available to it, it has not shown that the government has acted in callous disregard of its Fourth Amendment rights as required by the Pieper decision. There are a number of inaccuracies in the affidavit supporting the *1500 search warrant, but on the critical issue of the alleged fraudulent billings, Emerson has been unsuccessful in demonstrating material misrepresentations on the part of either Agent Lake or other government officials. For reasons of public policy, the Court has not allowed Emerson to engage in civil discovery in this matter because of the effect that such discovery might have on the government's ability to conduct legitimate criminal investigations. Like the majority in Franks, this Court believes that a party seeking to quash a search warrant alleging false statements in the warrant affidavit, whether indicted or not, should make a substantial preliminary showing of governmental misconduct before the discovery gates should be thrown open.
Having disposed of most of the issues raised by the parties in their arguments relating to the motion to quash, it should be clear the direction in which the Court is leaning with regard to this motion. However, given the multitude of issues addressed in this matter, the Court is hesitant to make a final ruling on the motion without allowing the parties a chance to consider the case as framed by the Court. This ruling is not meant to invite new arguments as to the issues that have been resolved. Nevertheless, if either party has additional information in the form of documents or affidavits that would have a bearing on the issue of the government's alleged bad faith regarding the search warrant affidavit, the Court will consider this in making its final ruling.
Accordingly,
IT IS HEREBY ORDERED that Emerson's amended motion to quash is HELD IN ABEYANCE for a period of ten (10) days from the date of this order.
NOTES
[1] See, In Re Harper, 835 F.2d 1273, 1274 (8th Cir.1988), Pieper v. United States, 604 F.2d 1131, 1133 (8th Cir.1979). For a useful discussion of the anomalous jurisdiction doctrine see, Slomanson, Civil Action for Return of Property: "Anomalous" Federal Jurisdiction in Search of Justification, 62 Den.L.Rev. 741 (1985), LaFave, Search and Seizure, § 11.2(h) Second Ed.
[2] The warrant is clearly sufficient on its face to provide probable cause to believe that fraudulent billings had been submitted for Department of Defense contracts. The scope of the warrant was also sufficiently precise as to the items to be seized and the areas to be searched. While the execution of the search was dramatic, the Constitution does not require a genteel approach to the execution of warrants where the element of surprise is vital to an effective search.
[3] The parties' arguments have addressed the requirements of both the Pieper decision and the Supreme Court's decision in Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) which dealt with a veracity challenge to a facially-sufficient search warrant affidavit by a defendant in a criminal case. In the latter case, which preceded the Pieper opinion and involved a post-indictment motion to suppress, the Supreme Court allowed the defendant to challenge a search warrant affidavit on the grounds that it contained material false statements made either recklessly or deliberately by the affiant. The Court permitted this attack only under specifically delineated circumstances and required that a defendant make a "substantial preliminary showing" of sufficiently culpable falsity, without which probable cause could not be shown, before the trial court could hold a hearing to inquire further into the matter. It appears that the Eighth Circuit has interpreted the Franks decision to apply only to post-indictment situations or circumstances where a criminal defendant files a motion to suppress. Pieper, like the case at bar, involved a pre-indictment situation where there was no pending criminal action. Professor LaFave also appears to assume that Franks does not apply in pre-indictment situations since he distinguishes precharge motions challenging a prior search from Franks and its progeny. LaFave, Search and Seizure, 2nd ed. § 11.2(h). Pieper sets forth a different test for determining when a search warrant may be quashed, (see above), and despite its more recent holding, does not even mention the Franks opinion.
[4] It is obvious that many members of the general public may have inferred from the publicity surrounding the search that Emerson is involved in criminal activity. This is an unfortunate occurrence since it is unclear at this point whether there is sufficient evidence of reasonable grounds to believe that a crime has been committed. The safeguards built into the Fourth Amendment by the nation's founding fathers are designed to protect innocent parties from government searches unless there is probable cause to believe that criminal activity is afoot. Obviously, if an individual has committed a crime, then the stigma that may arise is often deserved. When Fourth Amendment safeguards are ignored, however, the results can be very unfortunate. As the Honorable Jerome Frank commented:

The Government further argues than an indictment founded upon such illicit evidence will do the applicant no harm since such evidence will not be admitted at the trial which follows the indictment. That is an astonishingly callous argument which ignores the obvious. For a wrongful indictment is no laughing matter; often it works a grievous, irreparable injury to the person indicted. The stigma cannot be easily erased. In the public mind, the blot on a man's escutcheon, resulting from such a public accusation of wrongdoing, is seldom wiped out by a subsequent judgment of not guilty. Frequently, the public remembers the accusation, and still suspects guilt, even after an acquittal.
In Re Fried, 161 F.2d 453, 458-59 (2nd Cir.1947).
[5] Indeed, the warrant that was issued authorized a search for specified items that were likely to be evidence of violations of Title 18 U.S.C. §§ 287 and 1001. Both of these sections deal with acts of fraud committed against the United States.
[6] Reivich was a Franks type case in that it involved a criminal defendant who was already charged. While it is not directly controlling in a pre-charge situation where the Court is considering exercise of its anomalous jurisdiction, the principles set forth there have broad application to the case at bar.
[7] While Emerson's parts transfers themselves combined with management's disavowal and the isolated contract number are suspicious, the existence of a valid parts transfer procedure, when considered with these other representations, would leave the possibility of criminal wrongdoing (here fraud) as just thata possibility. If fraudulent billing was a plausible explanation for the circumstances alleged, but there were other equally plausible explanations (such as company error or even that the transfers were valid pursuant to the plan), then probable cause to believe that criminal activity was occurring did not exist. The Fourth Amendment does not allow the issuance of search warrants under such circumstances.
[8] This was not a Franks-type hearing as the parties assumed, (see footnote 3, supra), but rather was simply an exercise of the Court's inherent power to command government agents such as Lake to explain their actions when, as here, a colorable allegation of constitutional impropriety has been made. The Court has not exercised this discretionary authority lightly.
[9] This document has not been properly authenticated. Emerson should provide an appropriate supporting affidavit or the Court will not consider this letter in making its final ruling on the motion to quash.